**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for Crumbs Bake Shop, Inc., *et al.*,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>CRUMBS BAKE SHOP, INC., *et al.*,[1]<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 14-<br><br>Chapter 11<br>(Joint Administration Pending) |

**AFFIDAVIT OF JOHN D. IRELAND IN CONNECTION**
**WITH THE DEBTORS' CHAPTER 11 CASES**

STATE OF MARYLAND   )
                                         )SS.
COUNTY OF TALBOT   )

JOHN D. IRELAND, of full age, being duly sworn according to law, upon his oath,

deposes and states:

1. On the date hereof (the "**Filing Date**"), Crumbs Bake Shop, Inc. *et al.*, as debtors

and debtors-in-possession herein (collectively, the "**Company**" or the "**Debtors**"), each

commenced in this Court a case under Chapter 11 of title 11 of the United States Code,

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Crumbs Bake Shop, Inc. (5274); Crumbs Holdings LLC (8045); Crumbs 42nd Street II, LLC (5913); Crumbs Broad Street, LLC (5319); Crumbs Broadway LLC (2653); Crumbs Federal Street, LLC (9870); Crumbs Garment Center LLC (5142); Crumbs Grand Central LLC (5030); Crumbs Greenvale LLC (6562); Crumbs Greenwich, LLC (3097); Crumbs Hoboken, LLC (5808); Crumbs II, LLC (5633); Crumbs Larchmont, LLC (8460); Crumbs Lexington LLC (0286); Crumbs Park Avenue LLC (5273); Crumbs Retail Bake Shops, LLC (f/k/a Crumbs Fulton Street, LLC) (0930); Crumbs Stamford, LLC (8692); Crumbs Third Avenue LLC (6756); Crumbs Times Square LLC (1449); Crumbs Union Square LLC (8629); Crumbs Union Station LLC (6968); Crumbs West Madison, LLC (5017); Crumbs Woodbury LLC (2588)

11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"). I am the Chief Financial Officer of Crumbs Bake Shop, Inc. ("**CBS**") and have served in that capacity since May 2011. I am also the Chief Financial Officer of Crumbs Holdings, LLC ("**Holdings**") and have served in that capacity since May 2008 . I am fully familiar with the Debtors' business and financial affairs, and am duly authorized to make this Affidavit on the Debtors' behalf.

2. I submit this Affidavit to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in connection with the Debtors' voluntary Chapter 11 petitions and various motions and applications that will be filed with the Court during these Chapter 11 cases. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit. I submit this Affidavit to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in connection with the Debtors' voluntary Chapter 11 petitions and various motions and applications that will be filed with the Court during these Chapter 11 cases. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit.

3. This Affidavit is divided into (3) parts. Part I describes the Debtors' business, history, and the Debtors' prepetition organizational and debt structure. Part II describes the circumstances leading to the Chapter 11 filings. Part III sets forth the purpose of the Chapter 11 cases.

I. **FACTUAL BACKGROUND**

A. **The Debtors' Organizational History**

4. CBS is a Delaware corporation originally organized in October 2009 under the name 57th Street General Acquisition Corp. ("**57th Street**"). 57th Street was organized as a "blank check" company for the purpose of acquiring, through a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, exchangeable share transaction or other similar business transaction, one or more operating businesses or assets.

5. On January 9, 2011, CBS (then known as 57th Street), 57th Street Merger Sub LLC, a Delaware limited liability company and wholly-owned subsidiary of CBS ("**Merger Sub**"), Holdings, a Delaware limited liability company, and the members of Holdings, among others, entered into a Business Combination Agreement, as amended on February 18, 2011, March 17, 2011 and April 7, 2011 (the "**Business Combination Agreement**") pursuant to which Merger Sub merged with and into Holdings with Holdings surviving the merger as a non-wholly owned subsidiary of CBS (the "**Merger**"). Following the Merger, in October 2011, 57th Street changed its name to "Crumbs Bake Shop, Inc." to reflect the nature of its business more accurately.

6. Pursuant to the Business Combination Agreement, in February 2011, CBS commenced a tender offer, as amended, to ultimately purchase up to 1,803,607 shares of its issued and outstanding common stock. On May 4, 2011, 57th Street purchased all 1,594,584

3

shares of its common stock validly tendered and not withdrawn for an aggregate purchase price of approximately $15,914,000.

7. CBS is a holding company and does not conduct business operations except through its subsidiary Holdings. CBS's common stock was until recently listed on the NASDAQ Capital Market under the symbol "CRMB."[2]

8. Holdings has 50 subsidiaries (the "**Subsidiaries**"), including 29 that are not included in this filing. Each of those Subsidiaries is a limited liability company that was formed as the Debtors opened new retail locations throughout the United States.

**B.    The Debtors' Business Before Ceasing Operations on July 7, 2014**

9. Before July 7, 2014 when the Debtors ceased operations (described herein), the Debtors were one of the largest, most recognizable brand name cupcake specialty retailers in the United States. While cupcakes comprised a majority of their sales, the Debtors also offered other baked goods, including push up pops, cakes, cookies, pastries, scones, croissants, brownies and muffins as well as hot and cold beverages. The Debtors offered these products through retail stores, an e-commerce division, catering services and a wholesale distribution business.

10. The Debtors' headquarters are located in New York City. They also maintain offices in Preston, Maryland.

11. The Debtors' sales were substantially conducted through their retail stores consisting of street, mall and kiosk locations. The Debtors' first retail bake shop was opened in

---

[2] On June 20, 2014, CBS received a letter from the Listing Qualifications Department of the NASDAQ Stock Market notifying it that it has determined to deny CBS's request for continued listing of CBS's common stock on the Nasdaq Capital Market. Nasdaq suspended the trading of CBS's common stock effective July 1, 2014. Nasdaq's determination was based on CBS's failure to comply with the minimum $2.5 million stockholders' equity requirement for continued listing, coupled with the fact that the company did not meet at least one of the alternative minimum listing requirements.

4

2003 on the Upper West Side of Manhattan, New York. By 2013, and before the Debtors embarked on their restructuring plan (as described below), the Debtors had expanded their operations to include 78 locations across 12 states and Washington, D.C. As of March 31, 2014, there were 65 Crumbs Bake Shop stores operating in 12 states and Washington, D.C., including 17 stores in Manhattan, New York. As of July 7, 2014, the Debtors operated 49 stores in New York, New Jersey, California, Illinois, Washington, D.C., Connecticut, Massachusetts, Delaware, Pennsylvania, Rhode Island, Maryland and Virginia. The Debtors, through the Subsidiaries, are parties to leases for the premises at which some of these retail stores were located.

12. The Debtors generated a small percentage of sales through their other divisions. Through their e-commerce division at www.crumbs.com, the Debtors sold their baked goods nationwide for delivery to homes and businesses. In addition, the Debtors had a wholesale distribution business with accounts in the New York City area that purchased the Debtors' products, for sale in their respective businesses as "CRUMBS BAKE SHOP" cupcakes. The Debtors also generated sales through their catering business which they operated predominantly in New York.[3]

13. Beginning in early 2014, the Debtors launched a new and expanded licensing program by, among other things, introducing Crumbs Bake Shop products in all 201 BJ's Wholesale Club ("BJ's") locations in 15 eastern states. In connection with that licensing program, BJ's sold cupcakes, ice cream cupcakes, ice cream sheet cakes and Crumbnuts ™ (a cross between a croissant and a donut) under the Crumbs Bake Shop brand. In addition to those

---

[3] During 2013, cupcakes represented 78.4% of net sales. Sales of candy and other baked goods (*i.e.*, cakes, cookies, brownies, muffins and assorted pastries) in 2013 represented 9.5% of net sales. The stores also sold beverages including drip coffees, espresso-based drinks, whole-leaf teas and hot chocolate. In 2013, beverages represented 11.4% of Crumbs' net sales.

5

products sold at BJ's, the Debtors had signed licensing agreements with, among others, White Coffee for coffee beans, ground coffee and single serve cups, Pelican Bay for bake mixes, hot chocolate mixes and related novelty gift items, PKP for bake ware and baking tools and Pop!Gourmet Popcorn for flavored popcorn and popcorn bars. The Debtor's licensed products were also beginning to be sold through big-box retailers such as Target and Macy's. Before ceasing operations, the Debtors were continuing to pursue other licensing opportunities and distribution channels to expand their presence and enhance the Crumbs brand beyond their own brick and mortar stores.

14. The Debtors' intellectual property and confidential and proprietary information were material to the conduct of their business. As set forth above, to maximize cash flow, the Debtors pursued licensing and franchising opportunities. The Debtors' business plan focused on their ability to build further brand recognition using their trademarks, service marks and other proprietary intellectual property, including their name and logos.

15. The Debtors' baked goods were shipped daily from local bakers on a regional basis to their stores. The Debtors have exclusive production agreements with two (2) independent commercial bakers for the manufacture and daily delivery of their baked goods in the New York metropolitan, Chicago, Boston and Washington, D.C. area markets.

16. As of July 7, 2014, the Debtors had approximately 455 employees consisting of full-time salaried and hourly employees, of which approximately 68 were full time salaried employees and 387 were hourly employees. As of the Filing Date, however, the Debtors have 9 full-time salaried employees. All of the Debtors' current employees are employed in general or administrative functions, primarily in the Debtors' offices in New York City and Maryland.

52486/0001-10107478v6

17. As of December 31, 2013, CBS and the subsidiaries had consolidated assets of $20 million and liabilities of $19 million. Net sales in 2013 from the Debtors' retail operations were $47.2 million, an increase of 9.7% over $43.0 million in 2012. Net sales from Crumbs' catering services, e-commerce division and wholesale distribution business in 2013 were $1.9 million, an increase of 6.7%, compared to the $1.7 million recorded in 2012.

18. For the three months ended March 31, 2014, (a) net sales from the Debtors' retail operations were $9.1 million, representing a decrease of 24.8% when compared to $12.1 million for the three months ended March 31, 2013 and (b) net sales from Crumbs' catering services, e-commerce division and wholesale distribution business for the three months ended March 31, 2014 were $0.5 million, an increase of 8.1% compared to the three months ended March 31, 2013.

C. **Capital Structure**

  i. Secured Debt

19. On January 20, 2014, CBS and Holdings entered into a Senior Secured Loan and Security Agreement (the "**Secured Loan Agreement**") with Fischer Enterprises, L.L.C. ("**Fischer**") whereby Fischer agreed to make a term loan in the original principal amount of $5 million (the "**Fischer Loan**"). The Fischer Loan consisted of two tranches. The first tranche, in the original principal amount of $3.5 million, was funded on January 21, 2014, and the second tranche, in the original principal amount of $1.5 million, was funded on April 1, 2014. Each tranche is evidenced by a promissory note (the "**Fischer Notes**").

20. Pursuant to the terms of the Secured Loan Agreement, the Fischer Notes are senior to all other indebtedness of CBS and Holdings and are secured by all assets of CBS and Holdings, including equity in the Subsidiaries. The Fischer Notes are scheduled to mature on July 1, 2016. The Fischer Notes are convertible into shares of CBS common stock.

21. On July 10, 2014, the outstanding obligations under the Fischer Notes were assigned to Lemonis Fischer Acquisition Company, LLC (the "**Lender**") as evidenced by that certain Assignment of Loan and Loan Documents dated as of July 10, 2014. After the assignment of the Fischer Loan, the Lender advanced the Debtor $317,000 in connection with the Debtors' Chapter 11 filings, and the Debtors executed (a) an Amended and Restated Note dated as of July 10, 2014, in favor of the Lender and (b) that certain First Amendment to Senior Secured Loan and Security Agreement, dated July 10, 2014.

22. As of the Filing Date, $5,514,245.30 is due and outstanding to the Lender.

  ii. <u>Unsecured Debt</u>

23. On May 10, 2013, the Debtors sold and issued $7.0 million in aggregate principal amount of Senior Convertible Notes that will mature on May 10, 2018. On June 11, 2013, the Debtors sold an additional $3.0 million in aggregate principal amount of Senior Convertible Notes that will mature on June 11, 2018 (collectively, the "**Notes**"). Interest on the unpaid principal balance of the Notes accrues at 6.5% per annum and is payable quarterly in arrears. As permitted by the Notes, the Debtors have elected to convert all accrued interest through July 1, 2014 into common stock. Therefore, as of the Filing Date, the principal amount of the Notes and accrued and unpaid interest for the period July 1, 2014 through the Filing Date remains outstanding totaling approximately $9.3 million.

24. As of the Filing Date, the Debtors also estimate they have approximately $5 million of unsecured trade debt and other outstanding operating expenses including liabilities to certain of their landlords.

## II. <u>FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING</u>

25. Over the last decade, cupcakes became a cultural and economic phenomenon with gourmet cupcake shops proliferating across the United States. Consistent with this so-called

"cupcake craze," the Debtors experienced rapid growth in their store base and revenue from 2003 through 2011. The Debtors, however, were unable to sustain their early success and suffered declining revenue and increased operating losses during 2012 and 2013. For the year ended December 31, 2013, the Debtors recorded a loss from operations of $15.4 million compared to a net loss of $10.5 million for the year ended December 31, 2012.

26. The Debtors' business became increasingly competitive. The Debtors competed with well-established bakeries, cupcake-specific bakeries and other companies providing baked goods. Some of those competitors were in close proximity to the Debtors' retail locations negatively impacting the Debtors' sales. Additionally, the Debtors' growth simply outpaced the demand for cupcakes. The Debtors' business had been focused almost exclusively on cupcakes, a small niche in the retail baked goods industry. For various reasons, demand for cupcakes has waned. With limited product offerings in addition to cupcakes, the Debtors' sales suffered, dropping approximately 15% in 2013 in same store sales compared to 2012.

27. The Debtors also attributed their underperformance, reduced margins and lack of liquidity, in part, to a series of unsuccessful strategic, financial and operating decisions made in years prior, relating to the Debtors' growth strategy and leasehold obligations. The Debtors' rapid expansion during its early years led to substantial excess capacity and competition among the Debtors' own stores. Many of the Debtors' stores, especially those in Manhattan, Chicago and Washington, D.C. were located close to one another. As a result, many of those stores attracted customers within a common trading area thereby decreasing the same store sales at a pre-existing store. Moreover, many of the leases executed before 2012 had lengthy initial terms (generally between 10 and 15 years) with onerous provisions, rendering the Debtors' ability to relocate or close underperforming locations nearly impossible.

28. The Debtors' profitability and operating results were also negatively impacted by increased cost of sales. The Debtors' cost of sales continued to rise and comprised 46% of their net sales for the year ended December 31, 2013. The Debtors' increased cost of sales were caused, in part, by the delay in implementing a centralized automated ordering system. Before implementing that system, each of the stores were required to estimate and order sufficient inventory daily. Because stores were unable to predict the demand accurately, profitability and operating results were adversely affected. With the implementation of the centralized automated ordering system, the Debtors tried to focus their efforts on additional opportunities to increase efficiency and reduce cost of sales. Increased cost of sales were also negatively impacted by changing coffee vendors to Starbuck brand in September of 2012.

29. Before the Filing Date, the Debtors critically evaluated their long term business model. The Debtors initiated and explored alternative means to increase cash flow including licensing and franchising opportunities while at the same time implementing aggressive measures to control expenses and maximize cash flow. The Debtors closed ten (10) underperforming locations in 2013. In 2014, nineteen (19) additional underperforming stores were closed. The Debtors, however, were unable to resolve their liquidity issues quickly enough.

30. Given their severe liquidity constraints, the Debtors explored all means for obtaining financing to ensure they did not accrue liabilities to creditors and employees beyond their means to pay. The Debtors engaged in negotiations with their existing lenders and solicited other financing alternatives as well. Despite their best efforts, the Debtors were unable to secure sufficient financing to continue operations in the ordinary course. With limited available cash and the Debtors continuing to incur liabilities they could not pay, the Debtors were forced to cease operations on July 7, 2014.

31. After the Debtors shut down their operations, the Debtors renewed their negotiations with Fischer and others for financing in a last-ditch effort to maximize value of the Debtors' assets through a sale thereof. On July 10, 2014, the Debtors and the Lender (who had since taken assignment from Fischer) reached an agreement whereby the Lender would provide $1,133,000 of debtor-in-possession financing to the Debtors that will enable them to pursue an expedited sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code. With that agreement in place, the Debtors commenced these bankruptcy cases.

### III. THE PURPOSE OF THE CHAPTER 11 FILINGS

32. Essentially out of available funds, these Chapter 11 cases were commenced to maximize value for the benefit of all stakeholders. The Chapter 11 will provide the Debtors with access to sufficient financing to pursue an expedited sale of their assets The Debtors believe these Chapter 11 filings, and the pursuit of an expedited sale process involving substantially all of the Debtors' assets under Section 363 is in the best interest of the Debtors' creditors and other stakeholders.

_____
JOHN D. IRELAND

Sworn and subscribed to
before me this 11th day of
July, 2014

_Ronda Stinchcomb_
Notary Public, State of Maryland
My Commission Expires
Sept. 4, 2016

11