**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for Crumbs Bake Shop, Inc., *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>CRUMBS BAKE SHOP, INC., *et al.*,[1]<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 14- 24287 (MBK)<br><br>Chapter 11<br>(Joint Administration Pending)<br><br>**HEARING DATE AND TIME:**<br>July ____, 2014, at ___:___ __.m. |

**ORAL ARGUMENT REQUESTED**

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND TO ASSUME AND ASSIGN CERTAIN RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (5) GRANTING OTHER RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Crumbs Bake Shop, Inc. (5274) ("**CBS**"); Crumbs Holdings LLC (8045); Crumbs 42nd Street II, LLC (5913); Crumbs Broad Street, LLC (5319); Crumbs Broadway LLC (2653); Crumbs Federal Street, LLC (9870); Crumbs Garment Center LLC (5142); Crumbs Grand Central LLC (5030); Crumbs Greenvale LLC (6562); Crumbs Greenwich, LLC (3097); Crumbs Hoboken, LLC (5808); Crumbs II, LLC (5633); Crumbs Larchmont, LLC (8460); Crumbs Lexington LLC (0286); Crumbs Park Avenue LLC (5273); Crumbs Retail Bake Shops, LLC (f/k/a Crumbs Fulton Street, LLC) (0930); Crumbs Stamford, LLC (8692); Crumbs Third Avenue LLC (6756); Crumbs Times Square LLC (1449); Crumbs Union Square LLC (8629); Crumbs Union Station LLC (6968); Crumbs West Madison, LLC (5017); Crumbs Woodbury LLC (2588).

TO:    Honorable Michael B. Kaplan
       United States Bankruptcy Judge

   Crumbs Bake Shop, Inc., *et al.*, the within debtors and debtors-in-possession

(collectively, the "**Debtors**"), by and through their proposed counsel, Cole, Schotz, Meisel,

Forman & Leonard, P.A., respectfully represent:

## I.    INTRODUCTION AND JURISDICTION

   1.    This Verified Application is submitted in support of the Debtors' motion (the

"**Motion**") for an Order pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004

and 6006: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of

Substantially All the Debtors' Assets; (2) Approving Bidding Procedures and Form, Manner and

Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider

Approving the Highest and Best Offer; (4) Authorizing the Debtors to Sell Substantially All

Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and

Assign Related Executory Contracts and Unexpired Leases; and (5) Granting Other Related

Relief (the relief requested in subparts (1) through (3) is referred to as "**Part I of the Motion**"

and the proposed Order granting Part I of the Motion, submitted herewith, is referred to as the

"**Bidding Procedures Order**"; the relief requested in subparts (4) and (5) is referred to as "**Part

II of the Motion**" and the proposed Order granting Part II of the Motion, submitted herewith, is

referred to as the "**Sale Order**").

   2.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and

157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

   3.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

52486/0001-10675420v2

## II.    **BACKGROUND**

4.       On July 11, 2014 (the "**Filing Date**"), the Debtors filed voluntary petitions for

relief pursuant to Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

Since the Filing Date, the Debtors have remained in possession of their assets and continued

management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of

the Bankruptcy Code.

5.       A detailed description of the Debtors' business and the facts precipitating the

filing of these Chapter 11 proceedings are set forth in the Affidavit of John D. Ireland in support

of the Debtors' various "First Day Motions" (the "**Ireland Affidavit**").  Those facts are

incorporated herein by reference.

6.       As set forth in the Ireland Affidavit, before ceasing operations on July 7, 2014,

the Debtors were one of the largest, most recognizable brand name cupcake specialty retailers in

the United States.  While cupcakes comprised a majority of their sales, the Debtors also offered

other baked goods, including push up pops, cakes, cookies, pastries, scones, croissants, brownies

and muffins as well as hot and cold beverages.  The Debtors offered these products through retail

stores, an e-commerce division, catering services and a wholesale distribution business.

Additionally, the Debtors licensed the Crumbs brand to third parties such as BJ's Wholesale

Club, White Coffee, PKP-Mystic Apparel, Pop!Gourmet Popcorn and Pelican Bay.  Before

ceasing operations, the Debtors operated 49 stores in New York, New Jersey, Illinois,

Washington, D.C., Connecticut, Massachusetts, Delaware, Pennsylvania, Rhode Island,

Maryland and Virginia.  For the fourth quarter ending December 31, 2013, CBS and its

subsidiaries had consolidated assets of $20 million and liabilities of $19 million.  Given their

severe liquidity constraints, limited available cash and to avoid incurring liabilities they could

not pay, the Debtors were forced to cease operations on July 7, 2014.  The Debtors filed these

3

Chapter 11 cases to pursue a sale of their assets through Section 363, which they believe will maximize value for the benefit of all stakeholders.

A.    **Factors that Precipitated Section 363 Sale of the Debtors' Assets**

7.    The Debtors have experienced liquidity issues since 2012 when revenues started to decline and operating losses increased.  Since that time, the Debtors explored all options to address their financial condition and provide them with a sustainable capital structure.  In that regard, in January 2014, the Debtors obtained financing from Fischer Enterprises, L.L.C. ("**Fischer**") whereby Fischer agreed to make a term loan in the original principal amount of $5 million.

8.    Notwithstanding the infusion of capital from Fischer in early 2014, the Debtors were unable to resolve their liquidity issues.  Accordingly, the Debtors, in consultation with their advisors, determined that a sale of the Debtors' assets was in their best interests.  Before the Filing Date, the Debtors retained GlassRatner Advisory & Capital Group LLC ("**GlassRatner**") as financial advisor and investment banker to market the assets for sale.  GlassRatner initiated a broad pre-petition marketing process to solicit interest from potential investors.  That dual track process targeted potential investors that would (a) seek to acquire the Debtors' business and/or (b) provide the Debtors with capital to fund the ongoing operations.  In consultation with the Debtors, GlassRatner determined that only strategic investors or financial sponsors with an investment platform in the specialty food sector could provide a viable solution given the critical state of the Debtors' business.  As such, only those parties that met that specific criteria were contacted.

9.    Together with the Debtors, GlassRatner approached a total of 127 distinct parties through 149 individual telephone calls.  Of those parties contacted, 58 parties chose to receive the "Investment Teaser" and/or requested additional information in order to evaluate a potential

4

transaction.  As of the Filing Date, GlassRatner's marketing effort did not result in a formal

proposal from any other third party.

10.    After the Debtors shut down their operations, the Debtors renewed their

negotiations with Fischer for financing in a last-ditch effort to maximize value of the Debtors'

assets through a sale thereof.  On July 10, 2014, the Debtors and Lemonis Fischer Acquisition

Company, LLC ("**LFAC**" or "**Proposed Purchaser**") (who had since taken assignment from

Fischer) reached an agreement whereby LFAC would provide $1,133,000.00 million of debtor-

in-possession financing to the Debtors that will enable them to pursue an expedited sale of the

Debtors' assets pursuant to Section 363 of the Bankruptcy Code.  Additionally, the Debtors'

negotiations with LFAC culminated in a credit-bid asset purchase agreement (the "**Purchase**

**Agreement**"), a true copy of which is attached hereto as **Exhibit A**.

11.    The Debtors currently do not have sufficient cash resources or committed

financing to operate the Debtors' business and service ordinary course obligations for an

extended time period.  Accordingly, and after consultation with their advisors, the Debtors

ultimately determined the best course of action would be to commence Chapter 11 cases, secure

DIP financing and implement an expedited sale process with the Purchase Agreement serving as

the baseline bid.  The proposed Purchase Agreement, the only option currently available to the

Debtors to maximize their value, provides the platform for a competitive sale process subject to

higher and better offers.

III.    **SUMMARY OF THE MATERIAL TERMS OF THE PURCHASE AGREEMENT**[2]

12.    Pursuant to the terms and subject to the conditions of the Purchase Agreement, the

Debtors, subject to a Court-approved auction and sale process and any higher and better offers in

accordance with the proposed bidding procedures outlined below (the "**Bidding Procedures**"),

will sell to the Proposed Purchaser their right, title and interest in and to the Purchased Assets

and, in connection therewith, to assign to the Proposed Purchaser the Assumed Contracts (as

defined in the Sale Order).  The Proposed Purchaser will purchase the Purchased Assets and

acquire the Assumed Contracts free and clear of Liens and Claims (as defined in the Sale Order)

pursuant to Sections 363 and 365 of the Bankruptcy Code.

13.    The terms of the Proposed Purchaser's offer to purchase the Purchased Assets are

set forth in the Purchase Agreement, and are summarized herein:

(a)    Buyer.  The Purchase Agreement provides that if the credit-bid is successful, the Purchased Assets will be acquired by LFAC.

(b)    Purchased Assets.  Pursuant to Section 2.1 of the Purchase Agreement, the Buyer shall acquire the Purchased Assets, which shall include, among other things, all Assumed Contracts, all raw materials, work in process and inventory, fixed assets, leasehold improvements, equipment, tangible personal property and interests, prepaid expenses, prepaid rents, prepaid insurance utility deposits and deposits on contractual obligations, assignable permits, all cash and cash equivalents, all files, books and records, all rights in, to and under the Real Estate Leases identified on Schedule 2.1(h) of the Seller Disclosure Schedule, all rights, claims and causes of action, all warranties, guarantees and similar rights related to the Purchased Assets, all accounts receivable and all intangible assets and goodwill of the

---

[2] The foregoing is only a summary of the Purchase Agreement.  The reader is urged to consult the Purchase Agreement for a complete and accurate description of its terms.  Any capitalized terms used but not otherwise defined in Section III hereof shall have the meanings ascribed to them in the Purchase Agreement.

Debtors including the Purchased Intellectual Property.  <u>See</u> Purchase Agreement, § 2.1.

(c)    <u>Excluded Assets</u>.  Section 2.2 of the Purchase Agreement sets forth the Excluded Assets, which include, but are not limited to all  rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability, any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by Law to retain, all Avoidance Actions; all post petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to Sellers on a prepetition or postpetition basis unless specifically provided for under an Assumed Contract, in which case it will be a Purchased Asset, all Employee Benefit Plans and all trust funds and Contracts related thereto, all Excluded Contracts, any Assumed Contract that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained, all shares of capital stock, membership interests or other equity interest of any Seller or any securities convertible into, exchangeable for shares of capital stock or other equity interest of any Seller or any such subsidiaries, and all rights in or to assets leased by Sellers except to the extent the Liabilities under the associated lease are assumed by Proposed Purchaser and such lease is assigned to Proposed Purchaser as an Assumed Contract.  <u>See</u> Purchase Agreement, § 2.2.

(d)    <u>Assumed Liabilities</u>.  Section 2.3 of the Purchase Agreement sets forth the Assumed Liabilities that include, but are not limited to, all Liabilities of the Debtors under the Assumed Contracts and the other Purchased Assets that arise on or after the Closing Date or the Assumption Date, as the case may be; any Cure Costs that Purchaser is required to pay pursuant to Section 2.6(c) of the Purchase Agreement, all unpaid Administrative Expenses (other than those Administrative Expenses associated with Sellers' Professionals) in an amount up to $150,000; and any Transfer Taxes.  <u>See</u> Purchase Agreement, § 2.3.

(e)    <u>Excluded Liabilities</u>.  Purchaser will not assume and will be deemed not to have assumed, and Sellers will remain liable

7

with respect to, any and all Liabilities of Sellers arising out of, relating to or otherwise in respect of the Business, the Employees, or the Purchased Assets prior to the Closing Date, and all other Liabilities of Sellers, at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Sellers or any of their Affiliates other than the Assumed Liabilities. See Purchase Agreement § 2.4.

(f)     Cure Payments.  To the extent that any Assumed Contract requires the payment of Cure Costs in order to be assigned to Purchaser and assumed pursuant to Section 363 and 365 of the Bankruptcy Code, the Cure Costs related to such Assumed Contract shall be paid by the Purchaser. Purchaser retains the right to designate any executor contract as an Excluded Asset.  See Purchase Agreement § 2.6(c).

(g)     Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") will consist of (i) an amount equal to and payable in the form of a credit bid of the full amount of the obligations then outstanding under the DIP Credit Agreement and the Pre-Petition Senior Secured Loan (such amount as may be increased pursuant to Section 3.1(b), the "Credit Bid Amount"); and (ii) the assumption by Purchaser of the Assumed Liabilities.

(h)     Closing Date.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place one business day following the satisfaction or waiver of the conditions set forth in Article IX of the Purchase Agreement.

(i)     Representations and Warranties.  The Purchase Agreement contains representations and warranties of the Debtors in Article V, and of the Proposed Purchaser in Article VI.

(j)     Covenants.  The Purchase Agreement contains covenants of the Debtors in Article VIII.

(k)     Bankruptcy Court Matters.  The Purchase Agreement provides that the Buyer shall be entitled to an Expense Reimbursement and a Break-Up Fee equal to 3% of the Purchase Price.  The Purchase Agreement is subject to approval by the Bankruptcy Court and the consideration by the Debtors of higher or better competing bids.

52486/0001-10675420v2

      (l)    <u>Conditions to Closing</u>.  The Purchase Agreement contains conditions to Closing in Article IX.

      (m)    <u>Termination</u>.  The Purchase Agreement contains termination provisions in Section 4.4.

14.    The Debtors seek authority to sell the Purchased Assets to the Proposed Purchaser on the terms and conditions set forth in the Purchase Agreement or to a higher and better bidder to be determined in accordance with the Bidding Procedures.  The Debtors believe that the sale of the Purchased Assets to the Proposed Purchaser will result in a higher price for those assets than a piecemeal liquidation, will result in the assumption of certain obligations of the Debtors and their estates, and will provide for the resumption of business operations for the benefit of vendors, landlords, customers and employees.  The Debtors further believe that its securing the Proposed Purchaser as a "stalking horse" bidder and the holding of the Auction will result in the highest and best price for the Purchased Assets.

## IV.    RELIEF REQUESTED AND BASIS THEREFOR

15.    The Debtors request that this Court, <u>inter alia</u>, (i) authorize the sale of the Purchased Assets (the "**Sale**") to the Proposed Purchaser pursuant to the Purchase Agreement or to another Successful Bidder (as defined in the Bidding Procedures) pursuant to a competing asset purchase agreement entered into with such Successful Bidder in accordance with the Bidding Procedures, free and clear of all liens, claims, encumbrances, and interests pursuant to Section 363(b), (f), (k), and (m), (ii) approve the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code, (iii) approve the Purchase Agreement as a stalking horse bid, the Bidding Procedures and the form, manner and sufficiency of notice of the Sale, and (iv) grant such other and further relief as set forth in the Sale Order.

**A.**    **<u>The Debtors Should Be Authorized to Sell their Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code</u>**

16.     Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the

ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing,
> may use, sell, or lease, other than in the ordinary course of
> business, property of the estate.

11 U.S.C. § 363(b)(1).[3]

17.     Section 105(a) provides, in relevant part, that "[t]he court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

18.     Although the Bankruptcy Code does not articulate the standard for approving a

sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for

the Third Circuit in the seminal case of In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50

(3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good

faith purchaser" standard to mean one who purchases "in good faith" and for "value."  Abbotts

Dairies, 788 F.2d at 147.

19.     The Third Circuit in Abbotts Dairies then analogized the bona fides of a Section

363(b)(1) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

---

[3] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to
be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

52486/0001-10675420v2

Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198

(7th Cir. 1978)).

20.    Finally, the Court noted that '[t]raditionally, courts have held that "[f]air and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the

appraised value of the assets." Abbotts Dairies, 788 F.2d at 149; In re Karpe, 84 B.R. 926, 933

(Bankr. M.D. Pa. 1988).

21.    Respectfully, the sale of the Purchased Assets in accordance with the Purchase

Agreement and Bidding Procedures satisfies the Abbotts Dairies test.  First, the Debtors have

fully disclosed and requested the Court's approval of the Bidding Procedures and all the terms

and conditions of the Sale and proposed Auction (as defined below), and intend to provide

comprehensive notice of the Sale as discussed below.  See In re Colony Hill Assoc., 111 F.3d

269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles,

including whether there has been full disclosure to the Bankruptcy Court).  In addition, before

the Filing Date, the Debtors retained GlassRatner to market the Sale of the Purchased Assets,

which GlassRatner did in the months preceding the Chapter 11 filings.  While certain parties

expressed an interest, none were willing or able to put together an offer that would have paid the

secured debt in full in the time-frame required by the Debtors given their liquidity constraints.

Without a viable third-party bidder before the Filing Date, the Debtors negotiated with the

Proposed Purchaser for a commitment to buy the Purchased Assets pursuant to a credit bid.

After that commitment was secured in principle, the Purchase Agreement was negotiated by the

Debtors, their advisors, the Proposed Purchaser and its advisors at arms' length, and the Debtors

believe that the Purchase Price and other consideration being provided under the Purchase

Agreement represents reasonably equivalent value and fair consideration for the Purchased

Assets.  Lastly, the Debtors are hopeful that as a result of their intended notice of the Sale to all

potentially interested parties identified by GlassRatner, interested purchasers will be encouraged

to submit bids, attend the Auction and generate a spirited bidding process.

22.    In addition to the Abbotts Dairies requirements (which, respectfully, the Debtors

clearly satisfy), courts typically require a sound business purpose to sell assets outside of a plan

of reorganization.  In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Del. & Hudson Ry.

Co., 124 B.R. 169, 175-76 (D. Del. 1991); In re Titusville Country Club, 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989);

In re Conroe Forge & Mfg. Corp., 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); In re Indus.

Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15,21 (Bankr. E.D. Pa. 1987).

Courts consider the following non-exhaustive list of factors in determining whether a sound

business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable

notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the

amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be

proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future

plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the

property sold; and (h) whether the asset is decreasing or increasing in value.  Lionel Corp., 722

F.2d at 1071; Del. & Hudson Ry., 124 B.R. at 176; In re Weatherly Frozen Food Grp., Inc., 149

B.R. 480, 483 (Bankr. N.D. Ohio 1992).  A debtor's showing of sound business justification

need not be unduly exhaustive.  Rather, a debtor is "simply required to justify the proposed

disposition with sound business reason."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr.

S.D. Ohio 1984).

23.     Consideration of the above factors here unequivocally establishes that the Sale should be approved.  Based on the Debtors' pre-petition marketing efforts and those that will continue during the post-Filing Date Period, the Debtors will have, under the circumstances, amply marketed the Purchased Assets before the proposed date of the Sale Hearing (as defined below).  The Debtors have proposed Bidding Procedures designed to maximize the purchase price for the Purchased Assets.  Those Bidding Procedures and the form and manner of notice of the Sale have been submitted for approval to the Court and will ensure that any and all interested parties will receive adequate notice of the Auction to allow for a competitive sale process.

24.     Absent the Sale, whether to the Proposed Purchaser or another Successful Bidder, the Debtors will be unable to resume operations, the limited remaining employees will lose their jobs, businesses will lose the Debtors as a customer from which to generate revenue and the pre-petition lenders, as creditors, might incur significantly greater losses if they had to liquidate their collateral in a disorderly, piecemeal fashion.  For all these reasons, the Debtors respectfully submit that the Sale of the Purchased Assets is supported by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, the Debtors request approval of the Sale to the Proposed Purchaser, or the Successful Bidder, pursuant to Section 363(b) of the Bankruptcy Code.

**B.     The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

25.     The Sale of the Purchased Assets will not necessitate the appointment of a consumer privacy ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service
> discloses to an individual a policy prohibiting the transfer of
> personally identifiable information about individuals to persons
> that are not affiliated with the debtor and if such policy is in effect
> on the date of the commencement of the case, then the trustee may

13

not sell or lease personally identifiable information to any person
unless . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(1).

26.      Section 101(41A) defines "personally identifiable information" as an individual's

name, residence address, email address, telephone number, social security number or credit card

number, as well as an individual's birth date or other information that, if associated with the

information described previously, would permit the identification or contacting of the

individual."  11 U.S.C. § 101(41A).

27.      The Debtors' privacy policy provides that they "will provide individually-

identifiable information about consumers to third parties only if we are compelled to do so by

order of a duly-empowered governmental authority, we have the express permission of the

consumer, or it is necessary to process transactions and provide our services."  Based on the

language of the policy itself, Section 363(b)(1) is not implicated because the Debtors did not

disclose to an "individual a policy _prohibiting_ the transfer of personally identifiable

information."  See 11 U.S.C. §363(b)(1) (emphasis added).

28.      In any event, the buyer of the Purchased Assets will serve as a successor-in-

interest to the Debtors' privacy policy and utilize the "personally identifiable information" in

exactly the same fashion as the Debtors.  Accordingly, even if Section 363(b)(1) were implicated

(and it is not), the Court may authorize the proposed Sale without appointing a privacy

ombudsman because the transfer of the "personally identifiable information" is consistent with

the Debtors' privacy policy as provided in 11 U.S.C. § 363(b)(1).

52486/0001-10675420v2

C.      **The Debtors Should be Authorized to Sell their Assets Free and Clear of Liens, Claims and Interests Pursuant to Section 363(f) of the Bankruptcy Code**

29.      The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under Section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

1.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

2.      such entity consents;

3.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.      such interest is in bona fide dispute; or

5.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.      This statute authorizes the sale of assets "free and clear of any interest." The term "any interest," as used in Section 363(f), is not defined in the Bankruptcy Code. The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in Folger Adam Sec. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258 (3d Cir. 2000). The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards a "broader interpretation which includes other obligations that may flow from ownership of the property." Id. at 258. In turn, the Folger Adam Court cited with approval the Fourth Circuit's ruling in In re Leckie Smokeless Coal Co., 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger Adam, 209 F.3d at 258.

52486/0001-10675420v2

31.    The Debtors submit that one or more of the conditions set forth in Section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Purchased Assets.  In particular, Section 363(f)(2) will be met in connection with the transactions proposed because the Debtors expect that each of the parties holding liens, claims or encumbrances on the Purchased Assets will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale.

32.    Accordingly, the Debtors request that the Purchased Assets be sold and transferred to the Proposed Purchaser or the Successful Bidder free and clear of all Liens and Claims pursuant to Section 363(f) of the Bankruptcy Code (other than Liens and Claims specifically assumed or created by the Proposed Purchaser and Permitted Exceptions), including Liens and Claims of any Governmental Body.

**D.    LFAC Should Be Allowed To Credit Bid The Full Value Of Its Pre-Petition and DIP Secured Claims**

33.    Section 363(k) of the Bankruptcy Code states: "[a]t a sale under subsection (b) of [Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Indeed, "[i]t is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim."  See In re Fisker Auto. Holdings, Inc., 2014 WL 210593, *4 (Bankr. D. Del. Jan. 17, 2014)[4] (citing Radlax Gateway Hotel, LLC v.

---

[4] In Fisker, Chief Judge Gross recently observed that the language in Section 363(k) that the Bankruptcy Court may "for cause order[ ] otherwise" justified limiting a secured creditor's credit bidding rights to the amount it paid for its secured claim.  See Fisker, 2014 WL 210593, *4.  In that case, and critical to the court's ruling, the parties stipulated to the following facts (among others): "the assets offered for sale" would include "material assets that are not subject to properly perfected liens in favor of [the proposed credit bidder] and … material assets where there is a dispute as to whether [the proposed credit bidder] has a properly perfected lien, which dispute is not likely subject to quick or easy resolution."  See Fisker, 2014 WL 210593, *3.  The concerns that the court in Fisker confronted simply do not apply here.  FLAC, whether as DIP lender or as pre-petition secured lender, clearly has a (continued…)

Amalgamated Bank, 132 S.Ct. 2065 (2012); In re Philadelphia Newspapers, LLC, 599 F.3d 298

(3d Cir. 2010)).  Where a secured creditors' claim is allowed, as is the case here, it is well settled

in the Third Circuit that secured creditors can bid up to the full face value of their secured claims

under Section 363(k).  In re Submicron Sys. Corp., 432 F.3d 448 (3d Cir. 2006); In re GWLS

Holdings, Inc., Slip Copy, 2009 WL 453110 (Bankr. D. Del. 2009).  This proposition is

supported by other district and bankruptcy courts.  See, e.g., In re SunCruz Casinos, LLC, 298

B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("[T]he plain language of [Section 363(k)] makes clear

that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency

portion thereof." (emphasis in original)); In re Morgan House Gen. P'ship, Nos. 96-MC-l84 &

96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may

bid "to the extent of [their] claim" under § 363(k)); In re Midway Invs., Ltd., 187 B.R. 382, 391

n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's

allowed claim, including the secured portion and any unsecured portion thereof' (citing

legislative history) (alteration in original) (internal quotation marks omitted)); In re Realty Invs.,

Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (same); see also Criimi Mae Servs. Ltd. P'ship

v. WDH Howell, LLC (In re WDH Howell, LLC), 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).

34.    Further, a plain reading of Section 363(k) would permit a DIP lender that

maintains a lien on property securing its allowed claim to credit bid its debt to purchase property

subject to that lien.  There have been numerous orders entered in the lower courts in the Third

Circuit and outside the Third Circuit permitting DIP lenders to credit bid.  See, e.g., In re MEE

Apparel LLC and MEE Direct LLC, Case No. 14-16484 (CMG) (Bankr. D.N.J. April 25, 2014)

_____

(…continued)

lien on *all* of the assets it is acquiring under its credit bid and there can be no reasonable dispute as to the validity of
FLAC's liens and claims.

52486/0001-10675420v2

(approving DIP lender to credit bid); In re PTC Alliance Corp., Case No. 09-13395 (CSS), 2010

WL 5054210, at * 1 (Bankr. D. Del. March 10, 2010), Bidding Procedures Order (authorizing,

among other parties, the DIP lender to credit bid the DIP credit facility pursuant to section

363(k)); In re Champion Enters., Inc., Case No. 09-14019, 2010 WL 2723820, at *4 (Bankr. D.

Del. March 2, 2010), Sale Order (finding that the credit bid from the DIP lender constitutes a

valid, effective and enforceable credit bid pursuant to Sections 363(b), 363(k) and 363(n)); In re

KLCG Prop., LLC, Case No. 09-14418, 2010 WL 5093146, at *17 (Bankr. D. Del. Jan. 28,

2010), Final DIP Order (holding that DIP Lender may exercise its rights to credit bid its

indebtedness under Section 363(k) of the Bankruptcy Code); In re Delphi Corp., 2009 WL

2482146, at * 6 (Bankr. S.D.N.Y. July 30, 2009), Order Approving Modifications to First

Amended Plan (noting that at the auction of the debtor's assets, the DIP agent on behalf of the

DIP lenders made a credit bid for the debtor's assets, which was submitted in conformity with

Section 363(k) of the Bankruptcy Code, in an amount equal to 100% of the principal and interest

due and owing in respect of the DIP loan under the DIP credit agreement); In re Chrysler LLC,

Case No. 09-50002, 2009 WL 1360863, at * 10 (Bankr. S.D.N.Y. May. 4, 2009), Interim DIP

Order (the DIP Lenders may credit bid the loans and the additional notes under the DIP credit

facility pursuant to Section 363(k) of the Bankruptcy Code).

        35.    Accordingly, LFAC can bid any portion, or the full face value (as the Purchase

Agreement proposes), of its secured pre-petition loan and DIP loan claims under and to the

fullest extent permitted by Section 363(k) of the Bankruptcy Code.

**E.    Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code**

        36.    Section 363(m) of the Bankruptcy Code provides:

                The reversal or modification on appeal of an authorization under
                subsection (b) or (c) of this section of a sale or lease of property

does not affect the validity of a sale or lease under such
authorization to an entity that purchased or leased such property in
good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were
stayed pending appeal.

11 U.S.C. § 363(m).

37.    Section 363(n) of the Bankruptcy Code, among other things, provides that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  The Third Circuit in <u>Abbotts Dairies</u> noted the kind of misconduct that would destroy a buyer's good faith.  <u>Abbotts Dairies</u>, 788 F.2d at 147.

38.    The Purchase Agreement represents a negotiated, arms'-length transaction, in which the Proposed Purchaser has acted in good faith, without collusion or fraud of any kind. Additionally, the Purchase Price is significantly higher than what the Debtors believe they could recover in a liquidation.  Therefore, the Debtors respectfully request that the Court find that the Proposed Purchaser has purchased the Purchased Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and is entitled to the protections of Sections 363(m) and 363(n) of the Bankruptcy Code as reflected in the Sale Order.  If a party other than the Proposed Purchaser emerges as the Successful Bidder, the Debtors intend to make the appropriate showing at the Sale Hearing that such Successful Bidder satisfies the requirements of "good faith" and similarly is entitled to relief under Sections 363(m) and 363(n).

**F.    The Debtors Should Be Authorized to Assume and Assign the Assumed Contracts and Real Estate Leases**

39.    Section 365 allows the debtor in possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and by rejecting those that do not.  <u>Cinicola v. Scharffenberger</u>, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted).

19

40.    Under Section 2.6 of the Purchase Agreement, the Debtors shall assume and assign the Assumed Contracts to the Proposed Purchaser on the Closing Date. The Cure Costs, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts assumed at Closing, shall be paid by Proposed Purchaser, and the Debtors shall have no liability therefor. See Purchase Agreement § 2.6(c).

41.    In addition, under Section 2.6(c) of the Purchase Agreement, the Debtors agree that from the date of the Purchase Agreement through the date that is forty-five (45) days after the Closing Date, the Proposed Purchaser shall have the right to designate certain leases that it will decide to assume or reject at a later date. In addition to the Purchase Price, Proposed Purchaser shall promptly pay the reasonable and actual incremental costs or administrative claims incurred by the Debtors as a result of providing such rights and benefits to Proposed Purchaser or due to the deferral of the decision to reject such unexpired leases in order to provide such use or access. See Purchase Agreement, § 2.6(c). The Debtors shall, upon the written request of Proposed Purchaser, promptly make a motion in these cases to assume and assign to Proposed Purchaser any Real Estate Lease listed on Schedule 2.6(c) and any such Real Estate Lease shall be deemed to be a Purchased Contract. See id. The Cure Costs, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from any defaults under those Real Estate Leases set forth on Schedule 2.6(c) to be assumed and assigned to Proposed Purchaser shall be paid by Proposed Purchaser, and the Debtors shall have no liability therefor or thereafter. See id.

42.    Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume any executory contract or unexpired lease, subject to Court approval. 11 U.S.C. § 365(a). The

requirements for assumption of executory contracts and unexpired leases, if there has been a

default thereunder, are set forth in Section 365(b)(1):

> (b)(1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee [debtor-in-possession]
> may not assume such contract or lease unless, at the time of
> assumption of such contract or leases, the trustee:
>
> (A)    cures, or provides adequate assurance that the trustee will
> promptly cure, such default . . . .;
>
> (B)    compensates, or provides adequate assurance that the
> trustee will promptly compensate, a party other than the debtor to
> such contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C)    provides adequate assurance of future performance under
> such contract or lease.

11 U.S.C. § 365(b).

43.    Section 365 further provides that a debtor-in-possession may assign an executory

contract or unexpired lease if: (i) it assumes the contract in accordance with the provisions of

Section 365(b) of the Bankruptcy Code; and (ii) adequate assurance of future performance by the

assignee is provided.  11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the meaning

of "adequate assurance of future performance."  Courts have held that the words "adequate

assurance of future performance" must be given a "practical, pragmatic construction" in "light of

the proposed assumption."  In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola,

248 F.3d at 120 n. 10 (3d Cir. 2001)). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle

Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R.

436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean

absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc.,

53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case,

the required assurance will fall considerably short of an absolute guarantee of performance.").

52486/0001-10675420v2

44.     Among other things, adequate assurance may be given by demonstrating the
assignee's financial health and experience in managing the type of enterprise or property
assigned.  See In re Bygaph, Inc., 56 B.R. 596,605-06 (Bankr. S.D.N.Y. 1986) (adequate
assurance of future performance is present when prospective assignee of a lease from debtor has
financial resources and has expressed a willingness to devote sufficient funding to business in
order to give it strong likelihood of succeeding; chief determinant of adequate assurance is
whether rent will be paid).  See also In re Vitanza, Case No. No. 98-19611-DWS, 1998 WL
808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it
appears that the rent will be paid and other lease obligations met.")

45.     In addition, where the premises are in a shopping center, a debtor assigning such
lease must meet the additional provisions set forth in Section 365(b)(3) of the Bankruptcy Code
to ensure that "[t]he essential terms of a debtor's lease in a shopping center [are] not . . . changed
in order to facilitate assignment." L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home
Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir.), cert. denied, 531 U.S. 873 (2000) (internal quotations
and citations omitted).  That Section provides that adequate assurance of future performance of a
shopping center lease includes adequate assurance:

> (A) of the source of rent and other consideration due under such
> lease, and in the case of an assignment, that the financial condition
> and operating performance of the proposed assignee and its
> guarantors, if any, shall be similar to the financial condition and
> operating performance of the debtor and its guarantors, if any, as
> of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline
> substantially;
>
> (C) that assumption or assignment of such lease is subject to all the
> provisions thereof, including (but not limited to) provisions such as
> a radius, location, use, or exclusivity provision, and will not breach
> any such provision contained in any other lease, financing

agreement, or master agreement relating to such shopping center;
and

(D) that assumption or assignment of such lease will not disrupt
any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

46.     Here, the assumption and assignment of the Purchased Contracts are a necessary

part of the Purchase Agreement, and the Debtors satisfy all the relevant requirements of Section

365 of the Bankruptcy Code.  First, pursuant to the Purchase Agreement, all Cure Costs required

to be paid to the counterparties to the Purchased Contracts and Real Estate Leases must be paid

by the Proposed Purchaser.  As reflected in the Bidding Procedures Order, the counterparties to

the Purchased Contracts and Real Estate Leases will have sufficient opportunity to review and

object to the Debtors' cure statement (the "**Cure Statement**"), which reflects the amounts the

Debtors believe are due and owing to the non-debtor parties as of the Filing Date and will be

filed with the Court and served on the counter-parties within two (2) weeks after entry of the

Bidding Procedures Order.  In the event any potential disputes to the updated Cure Statement

cannot be resolved consensually, the Debtors will request that the Court schedule a hearing to

adjudicate the dispute and will escrow sufficient funds to pay those amounts pending Court

Order.

47.     The Debtors also request approval of the proposed Notice of the Debtors' Intent

to Assume and Assign Certain Executory Contracts and Unexpired Leases and of the Associated

Cure Costs (the "**Notice of Assumption and Assignment**") substantially in the form attached as

**Exhibit 3** to the Bidding Procedures Order.  The Notice of Assumption and Assignment is

intended to provide counterparties to the Purchased Contracts with the Cure Statement for their

applicable Purchased Contracts and simplified instructions of how they need to proceed with

respect to the proposed assumption and assignment of their respective Purchased Contracts to

Proposed Purchaser or the Successful Bidder.

48.    The Proposed Purchaser or Successful Bidder will demonstrate at the Sale

Hearing adequate assurance of future performance under the Purchased Contracts, including to

the extent required by Section 365(b)(3).  With respect to the Real Estate Leases, likewise, after

the Closing, upon the written request of Proposed Purchaser to promptly make a motion in these

cases to assume and assign to Proposed Purchaser any Real Estate Lease listed on

Schedule 2.6(c), the Debtors will make the appropriate adequate assurance of future performance

showing consistent with Section 365(b)(3), as applicable.

49.    Accordingly, given the requirements of Section 365 of the Bankruptcy Code are

satisfied, the Debtors should be authorized to assume and assign the Purchased Contracts to the

Proposed Purchaser or Successful Bidder.

**G.    The Bidding Procedures Are Reasonable and Appropriate**

50.    The Debtors propose and respectfully request approval of the Bidding Procedures

attached as **Exhibit 1** to the Bidding Procedures Order to govern the Auction and proposed Sale

of the Purchased Assets.

51.    In addition, the Debtors respectfully request that the Court schedule a hearing to

confirm the results of the Auction, if any, and to approve the Sale (the "**Sale Hearing**") no later

than two (2) days after the date of the Auction.  As set forth above, the Debtors retained

GlassRatner to market the Assets.  The Debtors firmly believe that GlassRatner's efforts in

marketing the Purchased Assets will have been maximized and, therefore, any delay in the date

of the Auction or the Sale Hearing will serve no meaningful purpose.  To the contrary, such

delay will only cause the further decline in value of the Purchased Assets to the detriment of the

Debtors, their creditors and estates.

**H..**    **The Expense Reimbursement and Break-Up Fee Should Be Approved**

52.    The Proposed Purchaser proceeded in reliance on promises by the Debtors to seek

the approval of a break-up fee in the amount of 3% of the Purchase Price (the "**Break-Up Fee**")

and an expense reimbursement (the "**Expense Reimbursement**" which together with the Break-

Up Fee is referred to collectively as the "**Stalking Horse Protections**") and in reasonable

expectation that this Court would enter an order providing such relief.  The Debtors submit that

the Stalking Horse Protections are a normal and oftentimes necessary component of sales outside

the ordinary course of business under Section 363 of the Bankruptcy Code.  In particular, such

protections encourage a potential purchaser to invest the requisite time, money and effort to

conduct due diligence and sale negotiations with a debtor despite the inherent risks and

uncertainties of the Chapter 11 process.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB)

(Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and

necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's

estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the

purchase agreement); Integrated Resources, 147 B.R. 650, 660 (Bankr. S.D.N.Y. 1992) (noting

that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by

providing some form of compensation for the expenses such bidder incurs and the risks such

bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus.,

140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be

reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid

from another bidder who would capitalize on the initial bidder's. . . due diligence"); In re

Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to

provide reimbursement of fees and expenses are meant to compensate the potential acquirer who

serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth

Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be

"legitimately necessary to convince a white knight to enter the bidding by providing some form

of compensation for the risks it is undertaking") (citations omitted).

53.    Moreover, bid protections, similar to the Stalking Horse Protections sought to be

approved by this Motion, have been approved by this Court, see In re Ashley Stewart Holdings,

Inc., et al., Case No. 14-14383 (MBK) (Bankr. D.N.J. April 3, 2014) (approving bidding

procedures); Bamboo Abbott, Inc. t/a Prestige Window Fashions, Case No. 09-28689 (MBK)

(Bankr. D.N.J. Jan. 14, 2010) (same); and in other Chapter 11 cases in this Circuit. See, e.g., In

re Dots, LLC, et al., Case No. 14-11016 (DHS) (Bankr. D.N.J. Feb. 21, 2014); In re 155 Route

10 Assocs., Inc., Case No. 12-24414 (NLW) (Bankr. D.N.J. June 29, 2012); In re Conex

Holdings, LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) (approving break-up

fee of 3% of final purchase price); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr.

D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale,

or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009)

(approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re

Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (CSS) (Bankr. D. Del.

Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with

a $11 million sale, or up to 11.4%); In re Archway Cookies, LLC, Case No. 08-12323 (CSS)

(Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25

million sale, or 3.8%); In re Wickes Holdings, LLC, et al., Case No. 08-10212 (KJC) (Bankr. D.

Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up

fee of up to 3%); In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW)

(Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); In re

Radnor Holdings, Case No. 06-10110 (CSS) (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and

expense reimbursement of 3% permitted).

54.    A proposed bidding incentive, such as the Break-Up Fee and Expense

Reimbursement, should be approved when it is in the best interests of the estate.  In re S.N.A.

Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc.,

166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio

1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's

estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181

F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a

business judgment standard in non-bankruptcy transactions the administrative expense

provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

55.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the

Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp.

("**Calpine**") as a "stalking horse" depended on whether such fees were necessary to preserve the

value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that

Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the

debtor's estate by promoting competitive bidding or researching the value of the assets at issue to

increase the likelihood that the selling price reflected the true value of the company.  Id. at 537.

The Debtors believe that approval of the Stalking Horse Protections will create such a

competitive bidding process.

56.    First, the Break-Up Fee induced the Proposed Purchaser to submit a bid that will

serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Proposed

Purchaser has provided a material benefit to the Debtors, their estates and their respective

27

creditors by encouraging bidding and increasing the likelihood that the best possible price for the

Purchased Assets will be received.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB)

(Bankr. 8. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit

to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. May 10,

2002); Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important

tool to encourage bidding and to maximize the value of the debtor's assets").

57.     Second, the Debtors believe that the proposed Expense Reimbursement is fair and

reasonably compensates the Proposed Purchaser for taking actions that will benefit the Debtors'

estates.  The Expense Reimbursement compensates the Proposed Purchaser for diligence and

professional fees incurred in performing diligence and in negotiating the terms of the Purchase

Agreement.

58.     Third, the proposed Stalking Horse Protections are the result of an arm's-length

negotiated agreement between the Debtors and the Proposed Purchaser.  There is no evidence or

reason to believe that the relationship between the Debtors and the Proposed Purchaser has been

tainted by self-dealing or manipulation.

59.     Fourth, the Debtors do not believe that the Stalking Horse Protections will have a

chilling effect on the sale process.  Rather, the Proposed Purchaser will increase the likelihood

that the best possible price for the Purchased Assets will be received, by permitting other

qualified bidders to rely on the diligence performed by the Proposed Purchaser, and moreover,

by allowing qualified bidders to utilize the Purchase Agreement as a platform for negotiations

and modifications in the context of a competitive bidding process.

60.     Accordingly, the Debtors request that the Court approve and authorize the

Stalking Horse Protections.

**I.**     **The Notice Provisions and Procedures Are Reasonable and Appropriate**

61.     Pursuant to Fed. R. Bankr. P. 2002(a) and (c), the Debtors are required to notify

creditors of the proposed sale of the Assets, including a disclosure of the time and place of the

Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.

62.     The Debtors submit that the notice procedures described above fully comply with

Fed. R. Bankr. P. 2002 and are reasonably calculated to provide timely and adequate notice of

the proposed sale of the Assets, the Bidding Procedures, the Auction, the Cure Cost, and the Sale

Approval Hearing to the Debtors' creditors and all other parities-in-interest that are entitled to

notice, as well all those parties that have expressed a *bona fide* interest in acquiring the

Purchased Assets.

63.     Based upon the foregoing, the Debtors respectfully request that the Court approve

the notice procedure proposed above, including the form and manner of service of the Sale

Notice attached as **Exhibit 4** to the Bidding Procedures Order.

**J.**     **Relief Under Bankruptcy Rule 6004(h) and 6006(d)**

64.     Pursuant to Fed. R. Bankr. P. 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of the assets pursuant to Section 363 of the Bankruptcy Code are

automatically stayed for fourteen (14) days after entry of the order.  The purpose of Rule 6004(h)

is to provide sufficient time for an objecting party to request a stay pending appeal before the

order can be implemented.  Additionally, Fed. R. Bankr. P. 6006(d) provides that "[a]n order

authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed

until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

65.     The purpose of Fed. R. Bankr. P. 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  See Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Fed. R. Bankr. P. 6004(h)

and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY, ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008).  The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

66.    As described above, time is clearly of the essence in connection with the Debtors' sale process.  The Debtors' post-petition financing envisions a swift, but thorough marketing and sale of the Assets.  The Debtors lack the working capital or access to further financing to rehabilitate their operations.  Therefore, to maximize the value received for the Purchased Assets and minimize accruing liabilities, the Debtors seek to consummate the sale of the Purchased Assets to the Successful Bidder as soon as possible following the Sale Approval Hearing. Enforcing the fourteen-day stay will cause the Debtors to incur rent for September 2014.  The Debtors have no means to satisfy that rent and, therefore, to extend the sale process as long as possible under the circumstances, and to ensure that a closing occur before September 1, the fourteen-day stay period should be waived.

67.    Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Fed. R. Bankr. P. 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Purchased Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## V.    <u>NOTICE</u>

68.    Notice of this Motion is being provided to (i) the United States Trustee, (ii) the holders of the twenty largest unsecured claims against each of the Debtors, (iii) any entity known

or reasonably believed to have asserted a security interest in or lien against any of the Debtors'

assets, (iv) counsel to the DIP lender, (v) all counterparties to executory contracts and the

unexpired leases, (vi) any entity that has expressed a *bona fide* interest in acquiring the Debtors'

assets, (vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix)

the United States Department of Justice and (x) all parties having filed requests for notices in

these Chapter 11 cases.

69.     Due to the nature of the relief requested herein, the Debtors submit that no other

or further notice need be given.

## VI.    CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the Motion by

entering the Bidding Procedures Order and Sale Order, and such other relief as the Court deems

just and appropriate under the circumstances.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Attorneys for CRUMBS BAKE SHOP,
INC., *et al.*, Debtors-in-Possession

By:    */s/ Michael D. Sirota*
       Michael D. Sirota, Esq.
       David M. Bass, Esq.
       Felice R. Yudkin, Esq.

DATED:  July 14, 2014

31

## <u>VERIFICATION</u>

JOHN D. IRELAND, of full age, certifies as follows:

1.      I am the Senior Vice President, Chief Financial Officer and Treasurer of Crumbs

Bake Shop, Inc., *et al.*, the within debtors and debtors-in-possession (the "**Debtors**").  As such, I

have full knowledge of the facts set forth in and am duly authorized to make this Verified

Application on the Debtors' behalf.

2.      I have read the foregoing Verified Application and certify that the statements

contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified

Application are willfully false, I am subject to punishment.


DATED:  July 14, 2014

                                        */s/ John D. Ireland*
                                        JOHN D. IRELAND

52486/0001-10675420v2