| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** | |
| **DISTRICT OF NEW JERSEY** | |
| **Law Offices of Mitchell Malzberg, LLC** | |
| Mitchell Malzberg, Esq. | |
| P.O. Box 5122 | |
| 6 E. Main Street, Suite 7 | |
| Clinton, NJ 08809 | |
| Telephone:  (908) 323-2958 | |
| Facsimile: (908) 933-0808 | |
| | |
| **McAFEE & TAFT** | |
| A Professional Corporation | |
| 10TH Floor, 2 Leadership Square | Case No. 14-24287 (MBK) |
| 211 N. Robinson | Judge: Michael B. Kaplan |
| Oklahoma City, OK 73102 | |
| Louis J. Price | Chapter 11 |
| Beauchamp M. Patterson | (Jointly Administered) |
| (405) 235-9621 | |
| (405) 239-0431 Facsimile | |
| Attorneys for DIP Lender Lemonis Fischer | |
| Acquisition Company, LLC | |
| In re: | Hearing Date: |
| | October 31, 2014 at 10:00 a.m. |
| CRUMBS BAKE SHOP, INC., *et al.*,[1] | |
| | |
| Debtors-in-Possession. | |

**Application of Lemonis Fischer Acquisition Company, LLC in Support of Motion For an Order In Aid of the Court's *Order Under 11 U.S.C. §§105(a), 363 and 365 (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing and Approving the Assumption and Assignment of Certain Unexpired Leases of Non-Residential Real Property In Connection With the Sale, and (III) Granting Related Relief* [Docket # 195], dated August 27, 2014**

Lemonis Fischer Acquisition Company, LLC ("LFAC"), moves this Court for

entry of an order in aid of the Court's prior *Order Under 11 U.S.C. §§105(a), 363 and 365 (I)*

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number are:  Crumbs Bake Shop, Inc. (5274); Crumbs Holdings LLC (8045); Crumbs 42nd Street II, LLC (5913); Crumbs Broad Street, LLC (5319); Crumbs Broadway LLC (2653); Crumbs Federal Street, LLC (9870); Crumbs Garment Center LLC (5142); Crumbs Grand Central LLC (5030); Crumbs Greenvale LLC (6562); Crumbs Greenwich, LLC (3097); Crumbs Hoboken, LLC (5808); Crumbs II, LLC (5633); Crumbs Larchmont, LLC (8460); Crumbs Lexington LLC (0286); Crumbs Park Avenue LLC (5273); Crumbs Retail Bake Shops, LLC (f/k/a Crumbs Fulton Street, LLC) (0930); Crumbs Stamford, LLC (8692); Crumbs Third Avenue LLC (6756); Crumbs Times Square LLC (1449); Crumbs Union Square LLC (8629); Crumbs Union Station LLC (6968); Crumbs West Madison, LLC (5017); Crumbs Woodbury LLC (2588)

*Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing and Approving the Assumption and Assignment of Certain Unexpired Leases of Non-Residential Real Property In Connection With the Sale, and (III) Granting Related Relief* (the "<u>Sale Order</u>"), dated August 27, 2014 [Docket # 195]. Specifically, for the reasons set forth below, LFAC requests entry of an order establishing and clarifying:

> (i)    That the Sale Order and the Asset Purchase Agreement dated July 11, 2014 conveyed all of Debtors' Intellectual Property free and clear of all Liens, Claims, Encumbrances and Interests leaving no interests remaining under the License Agreements (defined hereinafter at paragraph 6) and nothing further to be conveyed by the Debtors;

> (ii)    That §365(n) does not allow the third party licensees to use Debtors' trademarks as those rights are not included within the Bankruptcy Code's definition of "Intellectual Property" for purposes of the §365(n) election;

> (iii)    That the fact that LFAC did not assume the Brand Squared[2] Licensing ("<u>BSL</u>") Representation Agreement (hereinafter defined in paragraph 12 below) excludes BSL from any ongoing or future licensing relationship between LFAC and the third party licensees including, without limitation, removing BSL from collection of royalties;

> (iv)    That any past or future royalties derived as a result of a third party licensee's use of licensed Intellectual Property belong to and are directly payable to LFAC.

### Jurisdiction

1.    This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

2.    The statutory bases for the relief requested are §§105(a) and 541 of title 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## Background

3.      LFAC was the approved Stalking Horse Bidder pursuant to the Court's *Order: (1) Approving The Form of "Stalking Horse" Asset Purchase Agreement for the Sale of All or Substantially All of the Debtors' Assets; (2) Approving Bidding Procedures and Form, Manner and Sufficiency of Notice; (3) Approving Expense Reimbursement and Break-Up Fee; (4) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approving the Highest or Best Offer; (5) Approving the Form of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and of Associated Cure Amounts, and (6) Granting Other Related Relief* (the "Bid Procedures Order") dated July 25, 2014 [Docket # 79].   The Bid Procedures Order was entered following a full hearing on Debtors' original motion seeking approval of the bid procedures and notice procedures (the "Bid Procedures Motion"), which was filed on July 14, 2014 [Docket No. 22].

4.      LFAC submitted a credit bid to purchase substantially all of the Debtors' assets, including all "Intellectual Property" as defined in the *Asset Purchase Agreement By and Among Crumbs Bake Shop, Inc., Crumbs Holdings, LLC and Lemonis Fischer Acquisition Company, LLC* (the "APA") dated July 11, 2014.   The APA was attached to Debtor's Bid Procedures Motion and subsequently made part of the Bid Procedures Order.  A copy of the APA is attached hereto as Exhibit "1".

5.      The APA defined the Intellectual Property being sold, in pertinent part, as follows:

> "Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following:  all [ * * *] (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, designs, devices, signs,

symbols, design rights including product design, configuration and packaging rights, internet domain names, user names, screen names, Internet and mobile account names (including social media names, "tags," and "handles"), icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing **(collectively, "Trademarks")**; [* * *] and (iv) confidential or proprietary information, inventions and invention disclosures (whether patentable or not and whether or not reduced to practice), improvements, unregistered designs, trade secrets, and know-how, including methods, processes, procedures, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, Recipes and compositions, drawings, prototypes, models, discoveries, technology, research and development and customer information and lists **(collectively, "Trade Secrets")**, together with all rights of action and remedies for past, present and future infringement of any of the foregoing Intellectual Property.

*See* Exh. "1", APA, at p. 4 (emphasis added).

6.      The APA also contained Debtors' representation that the purchased Intellectual Property "constitutes all of the Intellectual Property used in the operation of the Business," including all of Debtors' material registered and unregistered trademarks and proprietary marks identified in Section 5.7(a) of the Sellers Disclosure Schedule that were subsequently licensed under the various written Intellectual Property licenses separately identified in Section 5.7(b) of the Seller Disclosure Schedule[2].  A copy of the Seller Disclosure Schedule is attached hereto as Exhibit "2".

---

[2] §5.7(a) of the Seller Disclosure Schedule identified the following license agreements (the "License Agreements") that are the relevant to these proceedings: (i) License Agreement between Crumbs Bake Shop and Coastal Foods Baking LLC, dated December 27, 2013; (ii) License Agreement between Crumbs Bake Shop and Pelican Bay Ltd, dated December 16, 2013;(iii) License Agreement between Crumbs Bake Shop and White Coffee Company, dated October 15, 2013; (iv) License Agreement between Crumbs Bake Shop and Uncle Harry's, Inc., dated December 13, 2013; (v) License Agreement between Crumbs Holdings LLC and Mystic Apparel, LLC, dated December 1, 2013; and (vi) License Agreement between Crumbs Holdings LLC and POP! Gourmet, May 16, 2014.

7.     The Bid Procedures Motion was brought upon Verified Application [Docket no. 22-1] made with the supporting affidavit of John Ireland, Debtors' Chief Financial Officer [Docket No. 11].   The Verified Application summarized the material terms, but advised all interested parties to review the full APA for a complete and accurate description of its terms. Both the APA and the Sellers Disclosure Schedule were available upon request from the Debtors.

8.     The Court determined that the notices given in regard to the Bid Procedures Motion, the Bid Procedures Order, the auction (and its subsequent cancellation) and ultimately the sale itself (along with all hearings corresponding to each event) was "given in accordance with the directive of the Court and as otherwise required by applicable law" and was "fair, reasonable and sufficient under the circumstances, and any otherwise applicable requirement for notice is hereby waived and dispensed with."   *See* Sale Order, dated August 27, 2014, ¶¶ B-D [Docket # 195].

9.     The Sale Order itself included expansive language for the purpose of ensuring that that the winning bidder would take the Purchased Assets free and clear of existing interests, stating in full:

> The transfer of the Purchased Assets to Purchaser shall constitute a legal, valid and effective transfer.  Except to the extent otherwise provided for in the Purchase Agreement or this Order, **title and interest in and to the Purchased Assets shall pass to Purchaser at Closing free and clear of all** liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (including, but not limited to, and "claim" as defined in Section 101(5) of the Bankruptcy Code), **interests**, and encumbrances, **including, but not limited to, any** lien (statutory or otherwise), hypothecation, encumbrance, liability, security interest, **interest**, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, reclamation claim, pledge, hypothecation, cause of action, suit, contract, right of first refusal, offset, recoupment, right of recovery, covenant, encroachment, option, right of recovery, alter-ego claim, environmental claim, successor liability claim, tax (including foreign, federal, state and local tax), Governmental Order, **of any kind or nature (including** (a) any conditional

sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (b) any assignment or deposit arrangement in the nature of a security device, (c) any claim based on any theory that Purchaser is a successor, transferee or continuation of any of the Debtors, or **(d) any leasehold interest, license or other right, in favor of a third party or the Debtors, to use any portion of the Purchased Assets)**, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, notices or unnoticed, recorded or unrecorded, contingent or non-contingent, perfected or unperfected, allowed or disallowed, liquidated or unliquidated, matured or unmatured, disputed or undisputed, material or non-material, known or unknown (other than Permitted Exceptions)(referred to collectively, whether having arisen, been incurred or accrued prepetition or postpetition, whether imposed by agreement, understanding, law, equity or otherwise, as the "Liens and Claims"), **pursuant to Section 363(f) of the Bankruptcy Code, with all such Liens and Claims upon the Purchased Assets to be unconditionally released, discharged and terminated**.

*See* Sale Order, at ¶3 (emphasis supplied).

10.    Upon entry of the Sale Order, LFAC contacted BSL requesting tender of all royalties accrued pre-acquisition and collected by BSL pursuant to the License Agreements, on grounds that all such royalties constituted  unpaid accounts receivable purchased by LFAC under the APA.  BSL complied with the request and tendered the royalties due and owing to LFAC.

11.    On August 28, 2014, one day after entry of the Sale Order, LFAC began negotiations with Coastal Foods Baking, LLC ("Coastal") for a new agreement replacing the License Agreement between Coastal and the Debtors, which both Coastal and LFAC knew had been included in Debtors' contemporaneously filed *Motion for an Order Authorizing them to Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. §§363 and 365(a) Nunc Pro Tunc to August 29, 2014* [Docket No. 197] (the "Rejection Motion").  Both Coastal and LFAC understood that the proposed new licensing agreement would not involve BSL in any capacity.  *See* Certification of Marcus Lemonis ("Lemonis Cert.")[Docket No. 241] at ¶¶4-5. The Certification of Marcus Lemonis is attached hereto as Exhibit "3".

6

12.     On September 8, 2014, BSL filed a response to the Rejection Motion asserting: (i) that Debtors' could not reject any License Agreement if the licensee elected to invoke §365(n) of the Bankruptcy Code to continue using the Debtors' intellectual property notwithstanding the sale to LFAC of all of the Debtors' assets; (ii) that in the event a licensee made an election under §365(n), BSL should be entitled to continue its role as licensing agent by virtue of BSL's separate Representation Agreement with the Debtors dated April 4, 2014 (the "Representation Agreement"), thereby allowing BSL to bill and collect royalty payments and to retain a 20% commission.

13.     Negotiations between LFAC and Coastal began to deteriorate almost immediately upon the filing of BSL's response.  One week later on September 15, 2014, after Debtors informed all parties that it would withdraw the Licensing Agreements and Representation Agreement from the Rejection Motion so to avoid a contested matter, BSL filed a supplemental response [Docket No. 214] asserting that non-rejection of the Licensing Agreements effectively left the Debtors' estate with a residual interest in each of the separate Licensing Agreements— namely the right to receive royalties thereunder should a licensee make a §365(n) election to continue using licensed intellectual property.  That same day, Coastal informed LFAC that it would not enter any new licensing agreement.  *See* Lemonis Cert., Exh. "3" at ¶7-8.

14.     In response to BSL's filings, both Coastal and third party licensee Pelican Bay, Ltd. ("Pelican Bay") filed responses with the Court indicating an intention to exercise whatever rights the Court deemed available to them under §365(n) to continue using the licensed intellectual property per their separate License Agreement. *See* Docket No.  239-1and Docket No. 242, respectively.

15.     LFAC now brings this motion seeking clarification from the Court in regard to the

Sale Order because of confusion expressed by BSL (and to a lesser extent by Coastal and Pelican

Bay) regarding the Court's "free and clear" conveyance determination and what, if any, effect it

has on the third party License Agreements and the Representation Agreement.

**I.      The Sale Order And Asset Purchase Agreement Dated July 11, 2014 Conveyed All
         of Debtors' Intellectual Property Free and Clear Of All Liens, Claims,
         Encumbrances and Interests, Leaving No Interests Remaining Under the License
         Agreements And Nothing Further To Be Conveyed by the Debtors.**

16.     The APA establishes that, as of the entry of the Sale Order, all of Debtors

Purchased Assets including the Intellectual Property would be conveyed to LFAC "[f]ree and

clear of all Liens"; language mirrored in the Sale Order itself, which conveys Purchased Assets

to LFAC "[f]ree and clear of all Liens and Claims to the fullest extent of §363(f) of the

Bankruptcy Code." *See* APA, Exh. "1", at p. 17, ¶ 5.6; Sale Order [Docket No. 195] at ¶H and

¶3.

17.     Because it gave full and effective notice of the Bid Procedures Motion, the Bid

Procedures Order and the final hearing on the Sale Order, and further made available upon

request all relevant documents including the APA and related schedules, Debtors allowed any

party with a direct or tangential interest in the Purchased Assets or a contract or arrangement

related to the Purchased Assets to appear in the case prior to entry of the Sale Order and contest

the effect of the sale on its respective interest.  Indeed, several interested parties did appear and

object to the proposed treatment of their respective interests, and were either afforded an

appropriate cure or were given adequate assurances of future protection of their interest.  None of

the third party licensees appeared at any point to contest the "free and clear" nature of the sale of

Intellectual Property or the effect that the sale would have on their respective License Agreements.

18.     In authorizing the sale of the Purchased Assets free and clear of the Liens and Claims (as defined in the Sale Order), the Court effectively cut off the rights of numerous third parties, including the third party licensees who—but for the free and clear sale—might have continued to have rights under the License Agreements.

19.     This is not an impermissible or even unexpected result.  Indeed, as a series of bankruptcy cases out of the United States Court of Appeals for the Seventh Circuit explains, it is precisely the result that should occur when a sale is approved free and clear under §363(f) of the Bankruptcy Code.     In FutureSource, LLC v. Reuters, 312 F.3d 281 (7th Cir. 2002), Judge Posner (citing sources from the Third Circuit Court of Appeals) concluded that when the sale of a debtors' assets is done with proper notice and conveys the debtor's assets "free and clear of all liens, claims and interests" under §363(a) of the Bankruptcy Code, the sale confirmation order is a final order sufficient to extinguish the interests of all third party licensees and commercial real property tenants who fail to appear and object prior to sale confirmation because their silence is deemed to constitute "consent" which is one of the bases on which a "free and clear" determination may be made under the Bankruptcy Code.   See FutureSource, 312 F. 3d. at 285-86, citing In re. Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994); In re Elliot, 94. B.R. 343, 345-46 (Bankr. E.D. Pa. 1988).

20.     Following FutureSource, the Seventh Circuit next decided Precision Industries, Inc. v. Qualitech Steel, SBQ, LLC, 327 F.3d 537 (7th Cir. 2003), in which the lessee of commercial real property sought to invoke its rights under §365(h) to continue possession of leased space in exchange for continued rentals despite the debtor's sale of the real property to a

purchaser "free and clear of all liens, claims encumbrances and interests" under §363(f).  The case was one of first impression in that court insofar as it seemingly pitted the express statutory rights of a real property tenant under §365(h) against the right of a debtor to sell "free and clear" under §363(f).

21.     In rendering its decision, the <u>Qualitech</u> court was able to refrain from elevating one code section over the other, and instead harmonized the two by relying on the different dynamics and considerations at play when a debtor is attempting to reorganize and emerge from chapter 11 versus when a debtor is selling substantially all of its assets.  The <u>Qualitech</u> court reasoned that "nothing in the express terms of section 365(h) suggests that it applies to any and all events that threaten the lessee's possessory rights.  Section 365(h) instead focuses on a specific type of event—the rejection of an executory contract by the trustee or debtor-in-possession—and spells out the rights of the parties affected by that event.  ***It says nothing at all about sales of estate property, which are the province of section 363.  The two statutory provisions thus apply to distinct sets of circumstances.***" <u>Qualitech</u>, 327 F. 3d at 547 (internal citations omitted)(emphasis added).

22.     The court went on to hold that "[w]here estate property under lease is to be sold, section 363 permits the sale to occur free and clear of a lessee's possessory interest [* * *].  Where the property is not sold, and the debtor remains in possession thereof but chooses to reject the lease, section 365(h) comes into play and the lessee retains the right to possess the property.  So understood, both provisions may be given full effect without coming into conflict with one another and without disregarding the rights of lessees." <u>Qualitech</u> at 548.

23.     Then the United States District Court for the Northern District of Illinois, relying both on <u>FutureSource</u> and <u>Qualitech</u>, took that principle and applied it to intellectual property

licensees asserting rights under §365(n) of the Bankruptcy Code. In Compak Companies, LLC v. Johnson, 415 B.R. 334 (N.D. Ill. 2009) the court found that, where the debtor gives adequate notice and then sells its intellectual property assets to a purchaser "free and clear of liens, claims, encumbrances and interests" under §363(f), that sale extinguishes the license rights of prior third party licensees leaving the licensees with no ability to make an election under §365(n) of the Bankruptcy Code.  See Compak, 415 B.R. at 334, 342-43 ("[a]s we interpret Qualitech, §365(n) would not prevent the trustee or the debtor-in-possession from extinguishing a license in a sale of intellectual property free and clear of interests provided one of §363(f)'s conditions was satisfied").  Indeed, the seminal consideration for the Compak court was whether the purchaser reasonably believed that it was acquiring [the debtor's intellectual property] free and clear of interests, not whether it knew what rights the bankruptcy court was purporting to extinguish." Compak at 342.

24.    These cases are directly applicable here.  The Bid Procedures Order, APA and Sale Order all indicated that the sale of Debtors' interests would be "free and clear of Liens and Claims" to the fullest extent allowable under §363(f) of the Code.  The fullest extent allowable means the complete cut off of the rights of third party licensees who failed to object to a free and clear sale where that sale directly impacted their rights, their silence constituting consent under 363(f)(2).  Thus irrespective of any subsequent rejection (which, practically speaking, was and is not necessary), the sale of the Debtor's Intellectual Property occurred free and clear of the rights of the third party licensees, with the Sale Order effectively operating to extinguish whatever rights the third party licensees (or the Debtors) otherwise had in that property—including the right to continue the use of that property or derive a royalty thereon.  All of those rights became LFAC's once the Sale Order was entered.

II.     **A §365(n) Election Does Not Allow The Third Party Licensees to Use Debtors'
        Trademarks As Those Rights Are Not Included In The Bankruptcy Code Definition
        of "Intellectual Property" for Purposes of §365(n).**

25.     Even if the Court were to find that the Sale Order did not extinguish the rights of

third party licensees to make an election under §365(n) of the Bankruptcy Code, any such

election is expressly limited with regard to what rights the licensee may exercise.  Specifically,

§365(n) provides:

> If the trustee rejects an executory contract under which the debtor is a licensor of
> a right to intellectual property, the licensee may elect [* * *] to retain its rights [*
> * *] under such contract, and under any agreement supplementary to such
> contract, to such intellectual property (including any embodiment of such
> intellectual property to the extent protected by applicable non-bankruptcy law), as
> such rights existed immediately before the case commenced [* * *].

11 U.S.C. §365(n)(1)(B)

26.     The definition of "intellectual property" is not actually found in §365(n) but rather

requires reference to §101(35A) of the Bankruptcy Code, which provides:

> (35A) The term "intellectual property" means—
>     (A) trade secret;
>     (B) invention, process, design, or plant protected under title 35;
>     (C) patent application;
>     (D) plant variety;
>     (E) work of authorship protected under title 17; or
>     (F) mask work protected under chapter 9 of Title 17, to the extent
>          protected by applicable non-bankruptcy law.

11 U.S.C. §101(35A).

27.     Conspicuously absent from the Intellectual Property definition is anything having

to do with trademarks, trade names, service marks or other similar proprietary marks.  In the

Delaware bankruptcy court case In re Global Holdings, Inc., et al., 290 B.R. 507 (Bankr. Del.

2003), Judge Walrath found that absence to be material and determinative of a licensee's rights.

There, the Debtors' original franchisees asked Judge Walrath to find either that their licensed

trademarks came within the purview of the Code's definition of "intellectual property" such that

the franchisees could retain their usage under §365(n), or that the franchisees could nevertheless retain their rights by paying the royalty stated in their prepetition franchise agreements. Judge Walrath declined, finding instead that "[t]rade names, trademarks, and other proprietary marks are expressly excluded from the definition of intellectual property," and on that basis determining "[a]s a result, the [licensees] are not protected by section 365(n) [and] therefore have only a claim for rejection damages under section 365(g)(1)." Id. at 512-513 (internal quotations omitted).

28.     To leave no doubt as to the basis for the result, Judge Walrath elaborated, stating that "[a]s a result of the rejection, the affirmative obligation of the Debtors to allow the Franchisees to use the marks is excused," and concluded "since the Bankruptcy Code does not include trademarks in its protected class of intellectual property, Lubrizol controls and the Franchisees' rights to use the trademarks stops on rejection." HQ Global, 290 B.R. at 513 (internal citations omitted).

29.     Both BSL and Coastal would have this Court ignore the straightforward analysis of HQ Global as well as the unambiguous language of the Bankruptcy Code and instead adopt a view not previously held by any bankruptcy court in the Third Circuit and which is merely referenced in dicta drawn from a concurring opinion in In re Exide Technologies, 607 F.3d 957, 964 (3rd Cir. 2010)(Ambro, J., concurring).

30.     The only issue actually before the Exide court was whether or not certain integrated agreements between the debtors and third parties (including at least one trademark licensing agreement) were sufficiently executory so as to be capable of rejection by the debtors. The court decided that they were not and remanded on that basis. See Exide, 607 F.3d at 964. Judge Ambro, writing for himself, decided to take the opportunity to address what he perceived

to be the inappropriate "negative inference" reasoning engaged in by numerous bankruptcy and district courts (including Judge Walrath in <u>HQ Global</u> and the United States District Court for the District of Delaware in the <u>Exide</u> case in chief) all of which found the absence of a reference to "trademarks" within the Bankruptcy Code definition of "Intellectual Property" to mean that that rights in a trademark license could not be revived under §365(n) of the Code.

31.     In attacking these results, Judge Ambro referenced Congresses own perceived limitations in crafting the definition contained in §101(35A) of the Code, and its lamentation that the rejection of executory trademarks, trade name and service mark licenses—while of concern—nevertheless "raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee." <u>Exide</u> at 966-7, <u>citing</u>, S. Rep. No. 100-505, at 5, reprinted in 1988 U.S.C.C.A.N. at 3204. Judge Ambro cited with approval Congresses plan to "postpone congressional action in [the trademark] area **and to allow the development of equitable treatment of this situation by bankruptcy courts**". <u>Id.</u> (emphasis supplied).  Indeed it appears to be this desire for 'equitable treatment' that leads Judge Ambro to state that "the Courts here should have used, I believe, their equitable powers to give Exide a fresh start without stripping [the trademark licensee] of its fairly procured trademark rights" and finally to conclude "[c]ourts may use §365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not-as occurred in this case-use it to let a licensor take back trademark rights it bargained away." <u>In re Exide</u>, 607 F.3d at 967-68 (Ambrose, J., concurring).

32.     It is the last part of Judge Ambro's concurrence that is most telling. In his view, it would be inequitable for a reorganizing debtor to continue to operate its business—and indeed to enjoy a "fresh start" emergence from chapter 11—with trademark rights that had been essentially

stripped away and recaptured from the debtors' prepetition licensing partners. Those equitable

consideration, however, do not come in to play when the debtor is selling all of its assets for

value to a *bona fide* purchaser free and clear of all interests so as to maximize value for the

benefit of creditors.    In those circumstances, adherence to the plain language of the "Intellectual

Property" definition is necessary because the alternative could (upon a licensee's post-sale

§365(n) election) cast the new owner into a licensor-licensee arrangement that it never intended

to assume, on terms it never intended to undertake and with a third party to whom the new owner

likely has no prior relationship.    Not only would this result leave the new owner/*bona fide*

purchaser with little or any ability to control the quality of products or services (which Congress

itself recognized as paramount to a workable trademark licensor/licensee relationship), but it

would absolutely undermine the Bankruptcy Code's stated preference for certainty and finality in

all sale orders.    The notion of a sale under Section 363 "free and clear" as evidenced by this

Court's Sale Order would have little meaning if the very interests at issue here survived and the

asset purchaser, LFAC, was unable to deal with the trademark rights as its own.

33.    Following the plain language definition here should result in a finding that none

of the licensees can elect to utilize the trademarks, trade names or proprietary marks licensed

under the Licensing Agreements.    That finding effectively renders the §365(n) election

inapplicable to the Licensing Agreement between the Debtors and Pelican Bay because the only

material interest licensed to Pelican Bay was the right to use the Debtors' trademarks and

proprietary marks. *See* Pelican Bay Licensing Agreement, Exhibit "4" attached hereto, p. 1. ¶¶

1.5 and 1.6.    The agreement with Pelican Bay was simply not "an executory contract under

which the debtor is the licensor of a right to intellectual property" as such term is defined in the

Bankruptcy Code.    The same analysis leads to a practically similar result with respect to Coastal,

however Coastal contends that it has also licensed the right to use some of Debtors' "secret recipes", which arguably fall within the §101(35A) definition of "Intellectual Property". *See* Exhibit "5" attached hereto, p.1, ¶¶ 1.5 and 1.6.  The question then is whether Coastal can effectively utilize such licensed Intellectual Property under the express terms of the Licensing Agreement (and generate the concomitant royalty required) <u>without</u> using any of Debtors' trademarks or proprietary marks.  The burden to make that showing is Coastal's.

III.    <u>The Fact that  LFAC Did Not Assume the BSL Representation Agreement Excludes BSL From Any Ongoing Or Future Licensing Relationship Between LFAC and the Third Party Licensees Including, Without Limitation, Removing BSL From The Collection of Royalties.</u>

34.    Even before the Representation Agreement was ultimately withdrawn from Debtors' Rejection Motion, BSL never raised any objection to its rejection.  What BML has attempted to do since its first appearance in this case is to shoehorn itself into protections not available to it under the Bankruptcy Code.  In its initial response, BSL effectively asked the Court to rule that any election made by a third party licensee under §365(n) should simultaneously operate to preserve BSL's right to commission payments under the Representation Agreement, and should extend that right to <u>prospective</u> commissions based on royalties not yet realized, but which might be earned at some future point.  BSL has yet to explain the basis for such a right.

35.    The Representation Agreement is a separate contract between BSL and the Debtors establishing the scope of "Services" to be provide by BSL on an ongoing basis, including: (i) the creation and establishment of licensing programs; (ii) annual review and updates of established licensing programs; (iii) identification and prospecting of potential licensees; (iv)  solicitation and negotiations of license agreements; (v) ongoing management of

licensing programs; (vi) collection of royalties; (vii) quality control and monitoring of the use licensed property; and (viii) annual program evaluations.

36.    BSL is not party to any of the License Agreements.  BSL is only referenced in the License Agreements as an entity to whom payments are to be made (but always with the express limitation that such payments are made to BSL "on behalf of Owner"), or to whom communications or reporting forms can be submitted (again, with the understanding that BSL's receipt of forms or communications is done on behalf of the Owner of the Licensed Property). BSL's involvement in each separate License Agreement is purely administrative, arising only because of BSL's separate Services obligation under the Representation Agreement. Therefore, rejection of the Representation Agreement (whether by renewal of the Debtors' Rejection Motion is it pertains to the Rejection Agreement or by virtue of the eventual refusal of the liquidating trustee to affirmatively assume the Representation Agreement) would necessarily and completely ends BSL's administrative involvement in all the arrangements contained in each separate License Agreement, including BSL's generation of invoices, its collection and distribution of royalty payments and its receipt of communications for or on behalf of the Owner of Licensed Property.

37.    An analogous situation exists under §365(h) of the Bankruptcy Code, where if a lessor of commercial real estate reorganizes in chapter 11 under circumstances giving rise to a tenant's right to remain in possession of leased space pursuant to §365(h)(1)(A), the tenant's invocation of that right does not obligate the debtor-lessor to also assume the pre-petition contract it had with its third party building management company.  Indeed, the tenant under those circumstances (just as the intellectual property licensee under §365(n)) is not entitled to

any corresponding lease performance from the lessor even if the tenant remains in possession of the leasehold for the entirety of the remaining term. 11 U.S.C. §365(h)(1)(B).

38.     Instead, the Bankruptcy Code allows a debtor-lessor (or, for that matter, a §363 purchaser acting through the debtor) to reject the building management agreement and free itself of its burdens, perhaps allowing the debtor to then enter into an agreement with a new party for the same services on more favorable terms, undertake building management obligations itself or decide to forego them altogether.   The effect of such a rejection is to convert the debtor's remaining obligations into a claim for damages that is treated as a pre-petition obligation "which may be written down in common with other debts of the same class." *Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC*, 686 F.3d 372, 377 (7th Cir.), *cert. den.*, 133 S. Ct. 790 (2012).

39.     Here, were BSL to show that it had earned compensation under the Representation Agreement for which it had not yet been paid, it may well have a claim.  Such claim, however, would be unsecured and enforceable only against the Debtors' estates.  It would not carry through as an LFAC obligation.   BSL claims it is owed more, arguing that the compensation it has already earned consists of commissions to be derived at some future point should one or more of the third party licensees elect to exercise whatever rights they are otherwise deemed to have under §365(n) of the Code and, in so doing, generate an obligation to pay a royalty for that use.  Absent from BSL's assertions is any explanation of how or why BSL should be allowed future commission payments when—without the Representation Agreement in place—BSL will no longer be providing the Services necessary to give rise to commissions.  The only possible explanation is that BSL believes its commission were fully earned and enforceable the moment each of the Licensing Agreements were signed, and that it needed do little more than

calculate the royalties owed, generate invoices and then sit and wait for royalty payments to come, taking its 20% commission off the top and passing the rest on to the Owner of the Licensed Property.  Were that the arrangement, however, there would have been no reason for BSL's compensation to be tied to continued provision of Services under the Representation Agreement.  Indeed, were BSL's position correct, it would in effect have been holding its own right to a royalty payment, belying the attributes of the Representation Agreement as an executory contract.   That is clearly not BSL's position inasmuch as it has argued to this Court that it is BSL's "unique" ability to collect the royalties that entitles it to some ongoing rights in this matter.

40.    Had LFAC decided BSL's Services under the Representation Agreement were beneficial to LFAC's future goals, LFAC could easily have included the Representation Agreement in the Purchased Assets or decided to assume the Representation Agreement. Notwithstanding BSL's strenuous assertions that it alone is the only party qualified to administer the License Agreements (as though BSL alone possesses the capability to analyze the License Agreements, implement their written royalty calculations, generate a corresponding invoices and process an account receivable), LFAC intentionally declined to take assignment of the Representation Agreement and so should not now be saddled with its obligations.  Forcing those considerations on LFAC would fly in the face of the Court's "free and clear" determination as set forth in the Sale Order.

**IV.    Any Past or Future Royalties Derived as a Result of Licensee's Use of Licensed Intellectual Property Belong to And Are Directly Payable to LFAC.**

41.    Should the Court ultimately determine that one or more of the third party licensees are entitled to continue using some portion of the Debtors' Intellectual Property, royalties generated by that use would not belong to BSL or the Debtors' estates.  Instead, those

royalties would belong to LFAC, either because of their connection to LFAC's ownership of the Intellectual Property or because the royalties constitute account receivables that LFAC specially purchased under the APA.

42.    Any use of licensed Intellectual Property engendered as a result of an election made under §365(n) requires a licensee to "make all royalty payments due under such contract for the duration of such contract . . .". 11 U.S.C. §365(n)(2)(B).  Here, the License Agreements make it clear that royalties payable thereunder are due to the "Owner" of the "Licensed Property".  From and after the closing of the APA and entry of the Sale Order, the owner of all of the Licensed Property (as that term is defined in the Licensing Agreements) is in fact LFAC. Accordingly, any royalties payable for continued use of licensed Intellectual Property must be paid to LFAC.  As Debtors expressly agree "all beneficial interest under the License Agreements belong to LFAC."  *See* Debtors September 24, 2014 Letter, p. 2, ¶3 [Docket No. 233].

43.    Additionally, section 2.1 of the APA specifically includes within the definition of Purchased Assets: [a]ll rights, claims, causes of action and credits owned by Sellers to the extent relating to any Purchased Asset or Assumed Liability, and  [* * *] all accounts receivable related to the Business."  APA, Exh. "1", p. 9, ¶¶ 2.1(j) and (l).  Thus to the extent that royalties were accrued and unpaid prior to the sale, or become due and payable as a result of the use of Intellectual Property, those monies constitute accounts receivable due and payable to LFAC as the owner thereof.

Respectfully submitted,


By: */s/ Mitchell Malzberg*
MITCHELL MALZBERG, ESQ.
LAW OFFICES OF MITCHELL J.
MALZBERG, LLC
P.O. Box 5122
6 E. Main Street, Suite 7
Clinton, NJ 08809
*Local Counsel for DIP Lender Lemonis*
*Fischer Acquisition Company, LLC*


-and-


By: /s/ Beauchamp M. Patterson
BEAUCHAMP M. PATTERSON, ESQ.
McAFEE & TAFT
10TH Floor, 2 Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
*Attorneys for DIP Lender Lemonis Fischer*
*Acquisition Company, LLC*

Dated: October 10, 2014