Douglas T. Tabachnik, Esq.
Law Offices of Douglas T. Tabachnik, P.C.
Woodhull House
63 West Main Street, Suite C
Freehold, NJ 07728
732-780-2760
Counsel for Brand² Squared Licensing
a Division of Peppercomm

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In re:

CRUMBS BAKE SHOP, INC., et al.,

          Debtors-in-Possession.

Chapter 11

CASE NO. 14-24287 (MBK)
(Jointly Administered)

**RESPONSE OF BRAND² SQUARED LICENSING ("BSL") TO THE MOTION, DATED OCTOBER 10, 2014 [DOCKET NUMBER 268] ("MOTION") OF LEMONIS FISCHER ACQUISITION COMPANY ("LFAC") TO MOTION FOR AN ORDER IN AID OF THE COURT'S ORDER AUTHORIZING AND APPROVING SALE, AND FOR RELATED RELIEF, DATED AUGUST 27, 2014 [DOCKET NUMBER 195] ("SALE ORDER")**

      BSL responds to the Motion of LFAC for an order in aid of the courts Sale Order, by and through its counsel, Law offices of Douglas T. Tabachnik, P.C., and respectfully shows to the Court as follows:

## INTRODUCTION

      1.      On August 27, 2014, this Court entered the Sale Order approving the sale of substantially all the Debtor's assets, including its intellectual property, to LFAC. Significantly, in the application for the approval of the order, while the Debtor filed the proposed asset purchase agreement (APA) it never placed before the Court the list of assets supposedly to be included in a Sellers Disclosure Schedule, referenced throughout the APA and incorporated therein. The day after the Court's entry of the Sale Order, the Debtor filed its motion to reject executory contracts, including a number of license agreements relating to the use of the Debtor's intellectual property,

1

including trademarks and trade secrets, as well as a representation agreement between the Debtor

and BSL.  This was the first notice provided by the Debtor of the licensing agreements not to be

included in the sale of assets. BSL administered the licensing activities related to the licenses

now sought to be rejected by the Debtor. In response to objections filed by BSL, and two of the

licensees, the Debtor withdrew that portion of its motion that sought to reject the license

agreements. LFAC now claims that, with the purchase of the underlying intellectual property, it

essentially vitiated any rights of third parties-essentially claiming that the language of

Bankruptcy Code section 363(f) overrides the language of section 365(n). As will be discussed

below, this is simply an erroneous reading of the two sections of the Bankruptcy Code and is not

supported by the majority of cases addressing this issue. It also fails to consider the compliance

issues inherent with section 363 itself, which required adequate protection to the affected

interests, but which requirement was essentially ignored with the failure by the Debtor to provide

the affected parties with notice of the consequences to their respective interests of the intended

transfer. The only harmonious interpretation of the record that can be achieved here is that the

licenses themselves were never transferred, nor any of the rights appurtenant to the same

transferred to LFAC. Accordingly, the Debtor retains its rights with respect to the licenses,

including the right to receive royalties, and the respective licensees retain their privileges for

utilization of the intellectual property of their respective licenses.

## BACKGROUND FACTS

2.      The Debtors filed their respective voluntary petitions under Chapter 11 of title 11

of the Bankruptcy Code on July 11, 2014. Shortly thereafter, they moved, on July 14, 2014 for a

motion to sell substantially all the Debtor's assets. (Docket number 22).

3.      The Debtors consist of 21 separate operating entities that are subsidiaries of

Crumbs Bake Shop, Inc. that, until July 2014, operated retail bakery outlets and, at the time of its

filing, also conducted business through "E-commerce sales, catering services and a wholesale

distribution business." (Affidavit of John Ireland, docket number 11). As of 2013, the Debtor's

operations included 78 locations across 12 states in Washington DC. Id. Beginning in early 2014,

the Debtors launched a new and expanding licensing program, including, inter alia, selling

product through 201 BJ's Wholesale Club locations in 15 Eastern states, plus additional products

sold under other licensing agreements including ice cream, coffee, popcorn, bake mixes, novelty

gift items and bake ware. Id.

4.      Annexed to the Debtors motion for the approval of the APA is a copy of the APA

itself, annexed thereto as "Exhibit A." In the motion itself the Debtor refers, at paragraph 13, to

the "Purchased Assets," which, in turn, refers to section 2.1 of the APA for its definition. The

term and paragraph itself then refer to those items as more particularly described in schedule 2.1

of the "**Seller Disclosure Schedule**." The purchased assets again refer to a term defined in the

purchase agreement at paragraph 2.1 called the "Purchased Intellectual Property." The excluded

assets defined in subparagraph (c) of paragraph 13 of the motion for approval of the sale list a

number of items including "Excluded Contracts" and "any Assumed Contract that requires the

consent of a third-party to be assumed and assigned hereunder as to which, by the Closing Date,

such consent has not been obtained...." All capitalized terms are defined in the APA.

5.      On page 8 of the APA, the Debtors and LFAC define the "Purchased Assets."

These include "all Assumed Contracts" and, at subparagraph (n) of paragraph 2.1, they provide

for the "Purchased Intellectual Property." The term "Purchased Intellectual Property" is, in turn,

defined on page 6 of the APA, as among other things, "all of the following intellectual property

3

owned by Sellers: the recipes used in the business or otherwise listed on section 1.1(d) of the **Seller Disclosure Schedule**. . . the Trademarks listed on section 5.7(a) of the **Seller Disclosure Schedule**" (Emphasis added). The "Seller Disclosure Schedule" is defined as "the disclosure schedule delivered by Sellers to Purchaser not later than five (5) business days following the date hereof." The term "Assumed Contracts" is, in turn, defined on page 2 of the APA as those contracts that are set forth in section 2.1 (a) of the **Seller Disclosure Schedule** and "have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by Sellers **or designated as Excluded Contracts pursuant to section 2.6(b)**." (Emphasis added).

6.      Paragraph 2.2 of the APA, on page 9 thereof, refers to Excluded Assets as including at subparagraph (f) "all Excluded Contracts". That term, in turn, is defined at page 3 of the APA, "'Excluded Contracts' means the Contracts set forth on Section 1.1(a) of the **Seller Disclosure Schedule**. . . ." (Emphasis added). As further discussed below, the Seller Disclosure Schedule, placed before the Court by LFAC for the first time with its moving papers, specifically lists the subject license agreements as among the "Excluded Contracts."

<u>LFAC NEVER PURCHASED THE RIGHTS APPURTENANT TO THE LICENSE AGREEMENTS</u>

7.      The APA itself contradicts LFACs position that it has purchased the rights appurtenant to the referenced license agreements. While it is noteworthy that LFAC now files, for the first time, the Seller's Disclosure Schedule, appurtenant to the APA, which lists the contracts intended to be rejected, the Sellers Disclosure Schedule itself further confirms the contradiction referenced above and supports the position that the license agreements still belong to the Debtor's estate. LFAC incongruously claims that, while it did not acquire any of the license agreements pursuant to the APA it is, nevertheless, entitled to all of the royalties derived

from the sale of products related to the license agreements.[1] LFAC is essentially arguing for the proposition that the sale of assets under section 363 effectively rescinded the related license agreements and the rights of all third parties whose rights flow from those license agreements as licensees have been terminated, even as it claims to be entitled to the royalties that flow from those very same license agreements.

8.      Concomitantly, LFAC now also claims that the Debtor has no right to any of the royalties flowing from license agreements, even though the same have not been rejected by the Debtor nor assumed and assigned to LFAC as part of the APA.  BSL, for its part, as a potential creditor of this estate, has asserted its rights to appear as such in this case and assert, as the Debtor has refused to assert, that the Debtor retains the respective license agreements at issue, and that the same remain assets of the estate with valuable rights to the receipt of continued royalties. Significantly, LFAC cannot point to any specific place in the APA where there is a specific delineation of the sale of the rights appurtenant to the respective license agreements with a concomitant to rejection of the related licenses. In fact, the Seller's Disclosure Schedules that were never filed as part of the approval of the APA, make the specific point that the licensing agreements are to be rejected by the Debtor, making it clear that the license agreements were not part of the sale. Accordingly, BSL has offered to acquire those rights in exchange for consideration that it would pay to the Debtor's estate.

9.      In addition to its erroneous reading of the Bankruptcy Code, LFAC relies for its argument upon an attempted factual sleight-of-hand by which it asserts (at paragraph six of its

---

[1] It is noteworthy on this point that the Debtor and LFAC disagree as to the entitlement of royalties. The debtor has maintained that it is entitled to all royalties earned prior to the closing and sale of the assets and the LFAC is entitled only to those royalties received after the sale closing [letter to Judge Kaplan from David Bass, dated September 24, 2014 (docket number 233), first full paragraph, page 2], while LFAC has asserted that it is entitled to all of the royalties earned, including those that have been paid, whether earned pre-closing or post-closing on the sale of assets [Certification of Marcus Lemonis filed on September 26, 2014, paragraph six (docket number 241)].

application) that the APA represented a sale of "all of the intellectual property used in the

operation of the business," and identified in section 5.7(a) of the newly disclosed Sellers

Disclosure Schedule. LFAC then identifies with great fanfare, at paragraph 5.7(b) of the Sellers

Disclosure Schedule, all of the license agreements related to the Debtor's business, in an

apparent effort to create the inaccurate impression that the license agreements are part of the

assets included in the sale. At no point does LFAC directly state that the rights appurtenant to the

license agreements listed in section 5.7(b) of the Seller's Disclosure Schedule are specifically

included in the sale, even though the underlying agreements themselves are to be rejected and

not included in the sale. At section 1.1(a) on the Seller's Disclosure Schedule are the referenced

license agreements as having been excluded from the sale. A copy of these two pages from the

Seller's Disclosure Schedule is annexed hereto as "Exhibit A". So, while LFAC points out that

the list of license agreements are right next to, and coming after, but not included in the

paragraph that describes all the intellectual property that is being sold, it neglects to point out

that the license agreements are specifically excluded as items of sale pursuant to the APA in the

very beginning of the Seller's own Disclosure Schedule.

10.    The only case that is disclosed by research having an almost identical fact pattern

to the one in the case at bar, Schlumberger Resource Management Services, Inc. v. Cellnet Data

Systems (In re CellNet Data Systems, Inc.), 277 B.R. 588 (D. Del. 2002), unequivocally holds

that a situation such as this case, the royalties continued to belong to the Debtor. In that case the

parties agreed to an asset sale pursuant to section 363 but disputed, and were unable to amicably

resolve the issue of the ownership of the royalties pursuant to the license agreements that were,

as here, specifically excluded from the sale. In essence, they agreed to disagree, reserving their

rights for later determination by the court. Id. at 590-91.  When the licensee at issue exercised its

rights under section 365(n) of the Bankruptcy Code, the issue was presented to the court for
disposition. The only distinction between the Schlumberger case and the one in the case at bar is
that the debtor in Schlumberger made an unequivocal rejection of the license agreements. In the
case at bar, the Debtor has withdrawn its motion to reject the subject license agreements that are
at issue.  The district court, in recounting the deliberations as described by Bankruptcy Judge
Walsh, noted that the bankruptcy judge relied upon the express language of the agreement and
the fact that the same unequivocally excluded the license agreements at issue in that case. Id. at
593. The district court noted,

> "Judge Walsh's reading of the documents was well-supported. The Asset Purchase
> Agreement and the March 24 letter, taken together, unambiguously show that
> Schlumberger wished to exclude the License Agreements from its purchase. **The March
> 24 letter specifically lists the License Agreements as "Excluded Contract[s].""**

Id. (emphasis added).

11.    Thus, the facts in the case at bar are not only identical in key respects to the
Schlumberger case, they are stronger, inasmuch as the Debtor actually withdrew its motion to
reject the referenced license agreements. Accordingly, not only are they excluded from the sale,
they unequivocally remain property of the estate, together with all of their benefits, including the
entitlement of the Debtor to receive royalties. The purchaser of assets in Schlumberger argued, as
LFAC does here, that it is entitled to the royalty payments from the licensees of intellectual
property by reason of its ownership of the underlying intellectual property. The court disagreed
noting

> Schlumberger has not produced, and the court is unaware of, any authority
> interpreting *§ 365(n)* to require that royalty payments be made to the owner of the
> intellectual property as a matter of law. Rather, *§ 365(n)(2)(B)* states that "the
> licensee shall make all royalty payments due under such contract . . . ." *11 U.S.C.*

*§ 365(n)(2)(B)*. Without considering the legislative history of this provision, it appears that Congress intended the language "due under the contract" to provide both the quantity of the royalty payments and the designation of the party intended to receive those payments, whether the debtor or its contractual assignee. Under the License Agreements, the royalty payments were to be made to CellNet. Because Schlumberger refused to acquire those Licence (sic) Agreements, under *§ 365(n)(2)(B)* CellNet remains entitled to receive the BCN royalties pursuant to statutory authority even if it rejected the License Agreements and is not technically a party to them.

Therefore, royalty payments made pursuant to *§ 365(n)(2)(B) of the Bankruptcy Code* are the property of the licensor, even though the licensor may have transferred its intellectual property assets during the bankruptcy.

Id. at 594-595. The district court further opined that the debtor was entitled to the royalties even though it rejected the license agreements by reason of the provisions of section 365(n). Id. at 595.

12.    LFAC also makes a point, in paragraph seven, that it supposedly gave notice of all terms to all parties and therefore all parties had ample notice to object to the approval of the APA. In fact, the very significant and material aspect of the APA, namely the rights of third parties affected by same, was never placed before the Court, nor disclosed to the affected parties until the day after the Court entered its Sale Order and only one day before the closing on the sale itself.

13.    It is respectfully submitted that the failure of the Debtor, at the time of the application for the approval of the APA, to file the Seller's Disclosure Schedule that is so intricately woven into the APA, materially affected the quality of the notice provided to all interested parties. Its omission meant that licensees were never advised of the Debtor's intention to surreptitiously attempt a rejection of their agreements and a rescission of their rights in violation of section 365(n) and applicable nonbankruptcy law. Accordingly, while the Debtors made a motion to sell all of their assets free of "liens, claims and encumbrances," at no time did

they mention that the affected claims specifically all license agreements and the rights of third

parties affected by same who would have otherwise been entitled to protection under Bankruptcy

Code section 363(e),[2] at a minimum, nor its intention to attempt a rescission of same as the intent

of the parties. Had they done so, the hearing on approval of the APA certainly would have

proceeded on a very different course. For the reasons set forth in the further discussion below,

this court should reject this effort at a stealth rescission of the Debtor's license agreements.

### NEITHER THE DEBTOR NOR LFAC CAN RESCIND LICENSE AGREEMENTS AND EXTINGUISH THE RIGHTS OF THIRD PARTIES BY REASON OF THE ASSET SALE PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE

14.    On September 8, 2014, BSL filed its response to the Debtor's motion for an order

authorizing rejection of certain executory contracts and unexpired leases, dated August 28, 2014

(docket number 205). While that discussion related to the Debtor's effort to reject the affected

license agreements, it is also relevant to this discussion insofar as LFAC now claims that it is

able to extinguish the rights under section 365 of the Bankruptcy Code by reason of its

acquisition of the underlying intellectual property under section 363(f). Accordingly, BSL

incorporates by reference the authorities and discussion cited in the September 8 objection and

further states as follows:

i. Section 363 of the Bankruptcy Code is Subject to Section 365

a) Express Language

---

[2] 11 U.S.C. § 363(e) provides:

> (e)      Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e) Lexis 2014).

15.     When section 363 of the Bankruptcy Code is read in its entirety, it is clear that

this section (in particularly, subsection (f) regarding "free and clear" sales) is subject to the

protective provisions in section 365(n). *See,* Michael St. Patrick Baxter, *Section 363 Sales Free*

*and Clear of Interests: Why the Seventh Circuit Erred in Precision Industries v. Qualitech Steel*,

59 Bus. Law. 475 (2004)(hereinafter the "Baxter Article"). Under section 363, sales outside the

ordinary course of business (363(b)) and sales within the ordinary course of business (363(c)) are

permitted. "Free and clear" sales are a subset of these sales, and must therefore fall under the

363(b) or 363(c) umbrella. As a result,

> any limitation on sales under § 363(b) or § 363(c) is also a limitation on free-and-
> clear sales under § 363(f). Sales under §§ 363(b) and (c) are limited by §§ 363(d),
> (e), and (l). Section 363(l) provides that sales in or outside the ordinary course of
> business are ''[s]ubject to the provisions of section 365 . . . .'' As a result, sales in
> or outside the ordinary course of business—including free-and clear sales under §
> 363(f)—are expressly subject to the provisions of § 365, in its entirety, by virtue
> of § 363(l). In other words, a free-and-clear sale under § 363(f) is subject to the
> provisions of § 365, and, therefore, is also subject to § 365(h).

Baxter Article, at pages 9-10. Because of section 365, and specifically §365(n), the Debtors

herein are not permitted to sell their assets "free and clear" of the intellectual property licenses at

issue.

b) Legislative History

16.     The legislative history of section 365(n) assists and understanding and correctly

applying 365's specific provisions. Section 365(n) states, in pertinent part:

Section 365(n) reads in relevant part:

(1)     If the trustee rejects an executory contract under which the debtor is a
licensor of a right to intellectual property, the licensee under such contract may
elect—

(A)     to treat such contract as terminated by such rejection if such rejection by
the trustee amounts to such a breach as would entitle the licensee to treat such

contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B)      to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—

(i)      the duration of such contract; and

(ii)      any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2)      If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—

(A)      the trustee shall allow the licensee to exercise such rights;

(B)      the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract.

11 U.S.C. § 365(n) (Lexis 2014).

17.      The legislative history of the enactment of this provision is recounted by Circuit

Judge Ambro in his concurring opinion in *In re Exide Technologies*, 607 F.3d 957 (3rd Cir.

2010):

In *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), cert. denied, 475 U.S. 1057, 106 S. Ct. 1285, 89 L. Ed. 2d 592 (1985)*, a licensor, Richmond Metal Finishers, granted a nonexclusive technology license to Lubrizol. The license stated that Richmond and Lubrizol owed each other certain duties. *See id. at 1045*. Shortly thereafter, Richmond filed for bankruptcy protection and sought to rescind the license by rejecting it under *§365*. The Fourth Circuit Court granted this request and "deprive[d] Lubrizol of all rights" under the license:

Under *11 U.S.C. § 365(g)*, Lubrizol would be entitled to treat rejection as a breach and seek a money damages remedy; however, it could not seek to retain its contract rights in the technology by

11

> specific performance even if that remedy would ordinarily be available upon breach of this type of contract.

*Id.at 1048*. The Court acknowledged that this interpretation of rejection as a termination "could have a general chilling effect upon the willingness of . . . parties to contract at all with businesses in possible financial difficulty." *Id*. "But," it said, "under bankruptcy law such equitable considerations may not be indulged by courts in respect of the type of contract here in issue." *Id*.

Reacting to industry concerns that "after *Lubrizol* any patent or trademark licensor could go into Chapter 11 and invalidate a license perfectly valid under contract law," Congress enacted *11 U.S.C. § 365(n)*. Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts, 74 Minn. L. Rev. 227, 307 (1989)*. Through this provision, Congress sought "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to *Section 365* in the event of the licensor's bankruptcy." S. Rep. No. 100-505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200.

Id. at 965-66.

18.    Judge Ambro continued,

Thus, in the event that a bankrupt licensor rejects an intellectual property license, *§365(n)* allows a licensee to retain its licensed rights--along with its duties--absent any obligations owed by the debtor-licensor.

Congress, however, did not include trademarks within the relevant definition of "intellectual property." Instead, it defined "intellectual property" only to include a:

> (A) trade secret;
>
> (B) invention, process, design, or plant protected under title 35;
>
> (C) patent application;
>
> (D) plant variety;
>
> (E) work of authorship protected under title 17; or
>
> (F) mask work protected under Chapter 9 of title 17;
>
> to the extent protected by applicable nonbankruptcy law.

> *11 U.S.C. § 101(35A).* Because Congress did not protect trademark licensees under *§ 365(n),* courts have reasoned by negative inference that it intended for *Lubrizol's* holding to control when a bankrupt licensor rejects a trademark license.

Id. (Citations omitted). It is noted parenthetically, that several of the license agreements at issue in this case provide for the utilization of trade secrets in the form of recipes utilized to make cupcakes, ice cream, coffee, bake mixes and popcorn. Accordingly, these particular licenses would still be protected even under the limited definition of "intellectual property" contained in the statute. *See, In re Matusalem*, 158 B.R. 514 (Bankr. S.D. Fla. 1993).

19.    Judge Ambro included among his references to the above referenced negative inference reasoning the case cited by LFAC, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 513 (Bankr. D. Del. 2003). However, he then goes on to specifically repudiate that line of reasoning as follows:

> But while the Supreme Court has endorsed reasoning from negative inference in the context of *§ 365, see NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522-23, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984)* (holding that *§ 365(a)* applied to collective-bargaining agreements covered by the National Labor Relations Act because Congress failed to draft an exclusion for them), I believe such reasoning is inapt for trademark license rejections.
>
> When Congress enacted *§ 365(n),* it explicitly explained why it excluded trademark licensees from the protection afforded to "intellectual property" licensees:
>
> [T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of *section 365* by the *Lubrizol* court and others, *see, e.g., In re Chipwich, Inc., 54 Bankr. Rep. 427 (Bankr. S.D.N.Y. 1985)*, such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts.

> S. Rep. No. 100-505, at 5, *reprinted in* 1988 U.S.C.C.A.N. at 3204. "Nor does the bill address or intend any inference to be drawn concerning the treatment of executory contracts which are unrelated to intellectual property." *Id.*

Id. at 966-67 (footnote omitted from above and reprinted in note following).[3]  The legislative

history of the 1988 *Act to keep secure the rights of intellectual property licensors and licensees*

*which come under the protection of title 11 of the United States Code, the bankruptcy code*. P.L.

100-506, is reprinted in Vol. F. *Collier on Bankruptcy* App. Pt. 41(g) (Alan N. Resnick & Henry

---

[3] Judge Ambro included a footnote at this point which is instructive for understanding the basis of the Congressional omission of trademark licenses from the definition of intellectual property. Judge Ambro's footnote reads as follows:

> This statement may stem from the recommendation of the National Bankruptcy Conference that "there should be in this legislative history a caveat that makes it clear that no negative inferences are to be drawn or should be drawn by courts that, because Congress has legislated in a particular way a licensing agreement, those other agreements that are not within the parameters of the legislation are to be dealt with in any particular way." *Intellectual Property Contracts in Bankruptcy: Hearing on H.R. 4657 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 100th Cong. 101 (1988) (statement of George Hahn, Esq., Representative, National Bankruptcy Conference).

Id. at 967. Judge Ambro went on to argue with force that rather than engage in the negative inference reasoning as some courts have done, they should have heeded the Congressional invitation to do equity and stated as follows:

> In light of these direct congressional statements of intent, it is "simply more freight than negative inference will bear" to read rejection of a trademark license to effect the same result as termination of that license. Michael T. Andrew, Executory Contracts Revisited, 62 U. Colo. L. Rev. 1, 11 (1991). "[T]he purpose of § 365" is not "to be the functional equivalent of a rescission, rendering void the contract and requiring that the parties be put back in the positions they occupied before the contract was formed." Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1306 (11th Cir. 2007). It "merely frees the estate from the obligation to perform," and "has absolutely no effect upon the contract's continued existence." Id. (internal citations omitted); see also 3 Collier on Bankruptcy P 365.14 n.3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (noting some take the view that "rejection by the debtor terminates the rights of the other parties to the contract as opposed to  [**22] being simply a determination not to perform, more in the nature of an abandonment, which was the intellectual source of the rejection concept"); 2 Norton Bankruptcy Law and Practice § 46:57 (3d ed. 2008) ("The Bankruptcy Code instructs us that rejection is a breach of the executory contract. It is not avoidance, rescission, or termination." (footnotes omitted)).

> By permitting Exide to "extinguish[]" EnerSys's right in the "Exide" mark through § 365 rejection, the Bankruptcy and District Courts failed to follow this path. Rather than reasoning from negative inference to apply another Circuit's holding to this dispute, the Courts here should have used, I believe, their equitable powers to give Exide a fresh start without stripping EnerSys of its fairly procured trademark rights. Cf. In re Matusalem, 158 B.R. 514, 521-22 (Bankr. S.D. Fla. 1993) (suggesting that rejection of a trademark license would not deprive a licensee of its rights in the licensed mark).

J. Sommer eds., 16th ed. 2014) The Seventh Circuit Court of Appeals adopted Judge Ambro's

analysis in *Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC*, 686 F.3d 372,

377 (7th Cir.), *cert den.* 133 S. Ct. 790; (2012). While the issues addressed in Judge Ambro's

concurring opinion and analysis in *Exide* concern themselves primarily with the analysis of the

issue of rejection of intellectual property agreements and the rights of licensees, which is not

directly at issue in this case, given the debtor's withdrawal of its motion to reject, it is instructive

in determining whether sections 363 and 365 collide, and if so, which statue takes preference

over the other.

c) <u>The Rules of Statutory Construction</u>

20.      As noted, the legislative history of this section 365(n), and the overwhelming

intent, expressed by the Congressional history to protect the rights of a licensee during the

bankruptcy process, are further buttressed by general rules of statutory interpretation.  While it is

true that section 363 refers to a debtor's sale of its assets "free and clear," section 363 must be

read in conjunction with section 365 of the Bankruptcy Code. That is because as a rule of

statutory interpretation, statutory provisions that deal with specific matters, such as section

365(n), prevail over provisions that deal with general matters, such as section 363. *See Fourco*

*Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228-29 (1957). The Court in *Fourco*

*Glass* explained the rule as follows:

> [T]he law is settled that 'However inclusive may be the general language of a
> statute, it 'will not be held to apply to a matter specifically dealt with in another
> part of the same enactment. . . . Specific terms prevail over the general in the
> same or another statute which otherwise might be controlling.'

*Id.*

21.    Section 365(n) specifically outlines the licensee's rights that are preserved when a license is rejected by a debtor-licensor in a Chapter 11 case. Section 363 applies generally to sales free and clear of non-debtor claims and interests. Congress has drafted section 365(n) to ensure that a third-party licensees rights will be protected. To allow the Debtors to do under section 363 what is prohibited under section 365(n) would ignore the detailed procedures set forth by Congress in section 365(n) that govern the rights as between a bankrupt licensor and its licensee when the licensee's rights under the license are at stake.

22.    In this regard, the analysis offered by a number of courts on the issue, when presented in conjunction with a discussion of Code section 365(h), which was designed to protect lessees of real property in the event of a rejection by their leases by a debtor landlord, is analogous for the same issues as they relate to section 365(n) (A concept acknowledged by LFAC in its motion at paragraph 37). *See*, the Baxter Article, *supra.* A majority of courts that have analyzed this precise issue agree. *See In re Haskell L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005) ("[W]here the Debtor is rejecting the lease with [the tenant], under its Liquidating Plan, [the tenant] has, at its option, the right to remain on the premises in accordance with § 365(h).... If the Court were to grant the Debtor's Sale Motion, the provisions of § 365(h) would be eviscerated. In other words, the Debtor would be doing indirectly what it could not do directly, namely, dispossessing [the tenant]."); *see also In re Zota Petroleums*, LLC, 482 B.R. 154 (Bankr. E.D. Va. 2012); *In re Samaritan Alliance, LLC,* 2007 Bankr. Lexis 3896 (Bankr. .E.D. Ky. Nov. 21, 2007); *In re Chira,* 367 B.R. 888 (S.D. Fla. 2007); *In re Churchill Properties III, Ltd. P'ship*, 197 B.R. 283; In re Taylor, 198 B.R. 142; *In re LHD Realty Corp.*, 20 B.R. 717 (Bankr. S.D. Ind. 1982).

23.     The concept of specific language prevailing over general language is not only in place to ensure that a specific provision consciously and deliberately thought out by Congress is not eviscerated by some broader and generic provision, it also guarantees the harmonious reading of statutes. *See, In re MF Global Inc.*, 506 B.R. 582, 592 (Bankr. S.D.N.Y. 2014)("To eliminate the contradiction, the specific provision is construed as an exception to the general one.")(internal quotations omitted). For example, the application of this canon of statutory construction to sections 365 and 363 leads to a harmonious reading of these Bankruptcy Code sections. Although section 363 allows for sales free and clear, if the sale triggers a rejection of a license by a debtor-licensor, then section 365 is obviously implicated. The licensee's rights are limited as a result of rejection, and the free and clear purchaser is free of affirmative obligations under the rejected license, but the rights of the licensee in such an instance remains for the duration of the license and any renewal term. Any other reading of these sections would ensure the destruction of specific rights and protections afforded by the Bankruptcy Code and intended by Congress.

24.     LFAC relies on *Futuresource, LLC v. Reuters Limited*, 312 F 3rd 281 (7th Cir. 2002), for the proposition that the sale of underlying intellectual property strips the respective licensees of any such property of their continuing rights to utilize the same. However, LFAC's reliance upon *Futuresource*, is misplaced as the facts of this case are inapposite to the facts in the case at bar. This case involves an agreement by the debtor to provide information services to a third-party and is readily distinguishable from one that simply conveys to the third-party a license to use intellectual property, as opposed to a third party's contractual right to receive continued services. In *Futuresource* the debtor, Bridge Information Services, had entered into an agreement to provide financial markets data for resale to Futuresource's customers. When Bridge

filed for bankruptcy its assets were purchased by Reuters, a competitor of Futuresource.

Futuresource then sued Reuters to compel it to continue to provide the data pursuant to the pre-existing agreement. It is under these circumstance that the court held that Reuters was under no obligation to continue to furnish the Bridge Data service to Futuresource for the duration of the pre-existing agreement, which had no termination date. Therefore, while there were intellectual property aspects to this agreement, as compilations of data that "involve a significant element of creativity" are subject to copyright, even though the data itself is not subject to such protections, Id. at 285, it is a far cry from a mere license of a trademark pursuant to which a third-party has received a conveyance of a right for a defined term, which requires no further input or obligation from the trademark owner, other than its receipt of the applicable royalties. Indeed, weighing heavily into the court's consideration that Futuresource's rights under the pre-existing agreement were extinguished, was its determination that Futuresource's interpretation of the pre-existing agreement to receive continued services from Reuters, as the purchaser of Bridge's assets, was "nonsensical." Id. at 284 ("So all that has to be decided is whether Reuters is obligated to furnish the Bridge data service to Futuresource free of charge until the end of time").

25.     LFAC next relies heavily upon the 2003 decision of the Seventh Circuit in *Precision Industries, Inc. v. Qualitech Steel, SBQ*, 327 F.3d 537 (7th Cir. 2003), which stakes out what is now generally considered to be a minority view by carving out an artificial distinction between the fact pattern in which a debtor sells its property on the one hand, pursuant to section 363, and when a debtor remains in possession of its assets but has otherwise determined to reject a lease, thereby triggering the protections of section 365(h), on the other. This decision was criticized almost immediately upon its publication, *see* the Baxter Article, *supra*, and is now considered, as stated above, to be the minority view of the apparent conflict between sections

363 and 365 of the Bankruptcy Code. *Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696 (S.D.N.Y.

2014) (while not endorsing the view that 365(h) provides an absolute right of lessees to remain in

possession in the event of a sale of assets, 365(h) nevertheless informs a sale under 363 such that

the rights of a lessee must still be taken into account under section 363, and the five conditions of

section 363 must be met before and interest can be conveyed free and clear).

26.     Significantly, the Seventh Circuit itself has moved away from its positions taken

in the decade old decisions of *Futuresource* and *Precision Industries*, and the inference that

section 363(f) trumped the provisions of section 365(n), with its decision in *Sunbeam Products,*

*Inc. v. Chicago American Manufacturing*, 686 F.3d 372 (7th Cir. 2012). The Seventh Circuit, in

*Sunbeam*, largely adopted the reasoning of Circuit Judge Ambros his concurring opinion in the

*Exide* case. In *Sunbeam,* the debtor sold its business to the plaintiff under section 363, and

rejected the license agreement that previously been given by the debtor/licensor to the defendant.

Furthermore, even while LFAC touts the continuing vitality of the largely discredited *Lubrizol*

decision by the Fourth Circuit in 1985, that prompted Congress's enactment of section 365(n) in

the first place (paragraph 27 and 28, quoting from Judge Walrath in *In re Global Holdings, Inc.*

290 B.R. 507 (Bankr. Del. 2003), which relied upon the Lubrizol decision), the Seventh Circuit's

decision in *Sunbeam Products* notes the almost uniform disregard for the *Lubrizol* decision and

unequivocally rejected it, holding:

> Scholars uniformly criticize *Lubrizol*, concluding that it confuses rejection with
> the use of an avoiding power. See, e.g., Douglas G. Baird, *Elements of*
> *Bankruptcy* 130-40 & n.10 (4th ed. 2006); Michael T. Andrew, *Executory*
> *Contracts in Bankruptcy: Understanding "Rejection"*, 59 U. Colo. L. Rev. 845,
> 916-19 (1988); Jay Lawrence Westbrook, *The Commission's Recommendations*
> *Concerning the Treatment of Bankruptcy Contracts, 5 Am. Bankr. Inst. L. Rev.*
> *463, 470-72 (1997). Lubrizol* itself devoted scant attention to the question whether
> rejection cancels a contract, worrying instead about the right way to identify
> executory contracts to which the rejection power applies. *Lubrizol* does not
> persuade us. This opinion, which creates a conflict among the circuits, was

circulated to all active judges under *Circuit Rule 40(e)*. No judge favored a
hearing *en banc*. Because the trustee's rejection of Lakewood's contract with
CAM did not abrogate CAM's contractual rights, this adversary proceeding
properly ended with a judgment in CAM's favor.

*Sunbeam Products* at 377-78. With this decision, the Seventh Circuit appears to have moved

decisively away from its decade-old holdings in *Futuresource* and *Precision Industries*.

    ii. The Failure of the Debtor to Even Attempt a Cursory Effort at Satisfying the
Obligations of Section 363 (F) (1)-(5) on the Sale Hearing with Respect to the Respective
Licensees, is Consistent with the Conclusion that the Intellectual Property was not Sold Free and
Clear of the Licensees' Respective Interests.

    27.    The Debtor, paying scant attention to the requirements of 363(f)(1)-(5) in its

original motion for approval of the APA, other than to essentially list the five requirements in the

abstract, never identified the specific interests, claims, etc. as to which the debtor's business was

being transferred free and clear from. Section 363(f)(1)-(5), requires that one of the following

five (5) requirements be met in order for property to be sold free and clear of liens, claims,

encumbrances and interests:

    (1) applicable nonbankruptcy law permits sale of such property free and clear of

such interest;

    (2) such entity consents;

    (3) such interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on such property;

    (4) such interest is in a bona fide dispute; or

    (5) such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest.

28.     Other than to simply recite the foregoing, the debtor never identified the interests affected by its sale until the day after the Sale Order was entered. Accordingly, no attention whatsoever was paid to whether or not nonbankruptcy law, for example, among the five requirements of section 363(f), would actually allow for the transfer that took place in this case as LFAC describes it, without regard to the interests of the respective licensees under section 365(n).  In point of law, as it relates to the respective licensees, nonbankruptcy law is unequivocal in its prohibition for the transfer of intellectual property free from the encumbrances of licenses that have been granted by a seller/transferor/licensor. It is well-settled that a transferee of trademark rights in a non-bankruptcy sale steps into the shoes of the transferor and does not take the property free and clear of licenses and rights of third party licensees. *See e.g.*, *ICEE Distributors, Incorporated v. J&J Snack Foods Corp.*, 325 F.3d 586 (5th Cir. 2003). Furthermore, even if the Debtors could demonstrate satisfaction of the 363(f) requirements, the Debtors would need to "adequately protect" the licensees under section 363(e) for the interest in property that would be lost. And, given the substantial investment made by the respective licensees in the promotion of the respective products in their care, as well as he fact that there will likely be no assets to distribute to unsecured creditors in this case,[4] it is only the continuation of the respective licenses that would adequately protect the licensees under the circumstances of this case as required by 363(e). "Where it is improbable that the lessee will receive any compensation for its interest from proceeds of the sale, and it is difficult to value the lessee's unique property interest, [] courts have similarly concluded that 'adequate protection can

---

[4] In the event that this court finds that the respective licenses are still property of the estate, as BSL contends, and the licensees continue to exercise their privileges under the respective licenses, BSL has stated, and contends that there could be substantial assets available to unsecured creditors, by reason of the resulting royalties to which the Debtor is entitled.

be achieved only through continued possession of the leased premises.'" *Dishi & Sons, supra*,

510 B.R. at 711-12 (*quoting*, *In re Haskell, L.P.*, 321 B.R. 1, 10 (Bankr. D. Mass 2005).

29.    Given the record in this case, and the clear and unambiguous language of the

APA and the Sellers Disclosure Schedule, clearly excluding the license agreements from the

sale, given further the failure of the Debtor to even attempt to present any evidence or make any

record on the sale hearing related to the respective license agreements and the adequate

protection to which they would have been entitled to be afforded pursuant to section 363, the

only harmonious conclusion that can be derived is that the Debtor never sold the license

agreements or any of the rights appurtenant thereto, and at the same remain property of the

estate, intact, with full Debtor's rights to receive the royalties and the respective licensees'

reciprocal rights to use the licensed properties.

CONCLUSION

WHEREFORE, for the reasons stated above, BSL respectfully requests that this Court

find that the intellectual property transferred to LFAC remains subject to the continued interests

of the respective licensees, that the respective license agreements remain property of the estate,

and that the Debtor continues to be entitled to the receipt of the attendant royalties emanating

from the license agreements, together with such other and further relief as to this Court seems

just, proper, and equitable.

Dated: October 24, 2014

                        Respectfully submitted,

                        LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C.
                        Counsel for BSL

                        By:  /s/ Douglas T. Tabachnik
                              Douglas T Tabachnik
                              Woodhull House
                              63 West Main St.
                              Freehold, NJ 07728-2141
                              (732) 780-2760