**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X

In Re:                                                    Chapter 11

CRUMBS BAKE SHOP, INC., *et al.*                          Case No. 14-24287

                      Debtors-in-Possession.
--------------------------------------------------------X

**APPEARANCES:**

Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Cole, Schotz, Meisel, Forman & Leonard
Court Plaza North
25 Main Street
Hackensack, NJ 07601
*Attorneys for Crumbs Bake Shop, Inc., et al.*

Mitchell Malzberg, Esq.
Law Offices of Mitchell J. Malzberg, LLC
P.O. Box 5122
6 E. Main Street, Suite 7
Clinton, NJ 08809

        -and-

Beauchamp M. Patterson, Esq.
McAfee & Taft
10th Floor, 2 Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
*Attorneys for Lemonis Fischer Acquisition Company, LLC*

Douglas T. Tabachnik, Esq.
Law Offices of Douglas T. Tabachnik, P.C.
Woodhull House
63 West Main Street, Suite C
Freehold, NJ 07728
*Attorney for Brand ² Squared Licensing
a Division of Peppercomm*

Jeffrey A. Cooper, Esq.
Barry J. Roy, Esq.
Rabinowitz, Lubetkin & Tully, LLC
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
*Attorneys for Coastal Foods Baking, LLC*

Sharon L. Levine, Esq.
Elie J. Worenklein, Esq.
Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, NJ 07068
*Attorneys for the Official Committee of Unsecured Creditors*

**MICHAEL B. KAPLAN, U.S.B.J.**

## MEMORANDUM DECISION

## INTRODUCTION

This matter comes before the Court on the motion of Lemonis Fischer Acquisition Company, LLC ("LFAC") for an order in aid of the Court's prior order ("Sale Order"), dated August 27, 2014, which, *inter alia*, authorized and approved the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances, and interests to LFAC. The issues now facing the Court are:

I.      Whether trademark licensees to rejected intellectual property licenses fall under the protective scope of 11 U.S.C. § 365(n), notwithstanding that "trademarks" are not explicitly included in the Bankruptcy Code definition of "intellectual property";

II.      Whether a sale of Debtors' assets pursuant to 11 U.S.C. §§ 363(b) and (f) trumps and extinguishes the rights of third party licensees under § 365(n); and

III.      To the extent there are continuing obligations under the license agreements, which party is entitled to the collection of royalties generated as a result of third party licensees' use of licensed intellectual property.

## JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (M), and (O). Venue is proper in this court under 28 U.S.C. § 1408. The court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.[1]

## BACKGROUND

Crumbs Bake Shop, Inc., *et. al.,* the within debtors and debtors-in-possession (collectively, the "Debtors") specialized in the retail sales of cupcakes, baked goods, and beverages. Debtors sold their products through retail stores, an e-commerce division, catering services, and wholesale distribution business. In addition, Debtors entered into licensing agreements with third parties, which allowed such parties to utilize the Crumbs trademark and trade secrets, and sell products under the Crumbs brand. To maximize licensing revenues, Debtors entered into a Representation Agreement with Brand² Squared Licensing ("BSL"). Under the Representation Agreement, BSL agreed to provide certain services to Debtors, including the provision of brand licensing services related to license agreements. On Debtors' behalf, BSL procured agreements ("License Agreements") with the following licensees for use of Debtors' trademark and trade secrets: Coastal Foods Baking, LLC; Pelican Bay LTD; White

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Coffee Company; Uncle Harry's, Inc.; Mystic Apparel, LLC; and POP! Gourmet (collectively, the "Licensees").

Given severe liquidity constraints, limited available cash, and to avoid incurring liabilities they could not pay, Debtors ceased operations on July 7, 2014. Thereafter, on July 11, 2014 ("Petition Date"), Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Code ("Bankruptcy Code"). Since the Petition Date, Debtors have managed their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

On the Petition Date, Debtors entered into a credit bid Asset Purchase Agreement ("APA") with LFAC for the sale of substantially all of Debtors' assets. On July 14, 2014, Debtors filed a motion ("Sale Motion") seeking, *inter alia,* Court approval of the APA, certain bidding procedures, and authorizing Debtors to sell substantially all their assets free and clear of liens, claims, encumbrances, and interests. Attached to the Sale Motion was a Proposed Order ("Proposed Order") for the sale of Debtors' assets to LFAC. On July 25, 2014, the Court entered an Order approving certain bidding procedures which contemplated an auction process. Debtors did not receive any higher or better offers other than the stalking horse bid from LFAC. On August 27, 2014, this Court entered the Sale Order, approving the sale of substantially all of Debtors' assets free and clear of liens, claims, encumbrances, and interests to LFAC.

On August 28, 2014, the day following approval of the sale, Debtors filed a motion ("Rejection Motion") to reject certain executory contracts and unexpired leases, including the License Agreements held with the aforementioned Licensees. Shortly thereafter, a response was filed by BSL asserting that Licensees could elect, under § 365(n), to retain their rights under their respective License Agreements. BSL also sought entitlement to royalties in the event Licensees elected to continue using the licensed intellectual property. On September 19, 2014, Debtors

withdrew the Rejection Motion only to the extent that it related to the License Agreements with

Licensees. This Court entered an order on October 1, 2014 authorizing the rejection of a number

of executory contracts, unexpired leases and licenses, but excluding those involving Licensees.

At this juncture, the parties seek a determination of the effect of the Sale Order on their

respective rights.

## DISCUSSION

*(I)*     ***Trademark licensees to rejected intellectual property licenses fall under the protective
scope of 11 U.S.C. § 365(n), notwithstanding that "trademarks" are not explicitly
included in the Bankruptcy Code definition of "intellectual property."***

Prior to the enactment of 11 U.S.C. § 365(n), the Fourth Circuit issued a decision in

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985), in

which a debtor-licensor moved to reject the intellectual property license it had granted to a

particular licensee. The court permitted the rejection under § 365, and held that the rejection of

an intellectual property license deprives the licensee of the rights previously granted under the

licensing agreement. *Id.* at 1048. The court stated that the rejection constituted a breach and, as

such, the licensee would be entitled to monetary damages under § 365(g). However, the Fourth

Circuit maintained that the licensee could not retain its contractual rights, and thus the licensee

was stripped of the rights it previously held under the licensing agreement. *Id.* The decision in

*Lubrizol* caused concern that "any patent or trademark licensor could go into Chapter 11 and

invalidate a license perfectly valid under contract law." *In re Exide Technologies*, 607 F.3d 957,

965 (3d Cir. 2010) (Ambro, J., concurring)  (citation omitted). This Court is not persuaded by the

decision in *Lubrizol* and is not alone in finding that its reasoning has been discredited. *See*

*Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC*, 686 F.3d 372, 377-78 (7th Cir. 2012)

("Scholars uniformly criticize *Lubrizol*, concluding that it confuses rejection with the use of an avoiding power.").

Three years after *Lubrizol*, Congress enacted 11 U.S.C. § 365(n). The relevant portion of § 365(n) reads as follows:

> (1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—
>
>> (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
>>
>> (B) to retain its rights (including the right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property ..., as such rights existed immediately before the case commenced for—
>>
>>> (i) the duration of such contract; and
>>>
>>> (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.
>
> (2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—
>
>> (A) the trustee shall allow the licensee to exercise such rights;
>>
>> (B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and
>>
>> (C) the licensee shall be deemed to waive—

> (i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and
>
> (ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

11 U.S.C. § 365(n). "Through this provision, Congress sought 'to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy.'" *In re Exide Technologies,* 607 F.3d at 965 (quoting S. Rep. No. 100-505, at 1 (1988)). Congress professed that courts allowing the use of § 365 to strip intellectual property licensees of their rights "threaten an end to the system of licensing of intellectual property . . . that has evolved over many years to the mutual benefit of both the licensor and the licensee and to the country's indirect benefits." S. Rep. No. 100-505, at 3 (1988). In response to this problem, Congress provided that when a debtor-licensor rejects an intellectual property license, the licensee is permitted to make an election under § 365(n). If the licensee chooses to retain its rights, the licensor is not bound by any continuing obligations under § 365(n).[2]

While § 365(n) applies to intellectual property licenses, the definition of "intellectual property" is not found within that section of the Bankruptcy Code; rather, the definition is found in § 101(35A). Therein, Congress failed to include explicitly trademarks. The definition of "intellectual property" reads as follows:

> (A) trade secret;
> (B) invention, process, design, or plant protected under title 35;
> (C) patent application;

---

[2] "[I]n the event that a bankrupt licensor rejects an intellectual property license, § 365(n) allows a licensee to retain its licensed rights-along with its duties-**absent any obligations owed by the debtor-licensor**." *In re Exide Technologies*, 607 F.3d at 966 (emphasis added). By way of analogy, when a debtor-licensor rejects a software license, § 365(n) would *not* require the licensor to provide continuing updates or maintenance to the licensee.

(D) plant variety;
(E) work of authorship protected under title 17; or
(F) mask work protected under chapter 9 of title 17;
to the extent protected by applicable nonbankruptcy law.

11 U.S.C. § 101(35A). Some courts have reasoned by negative inference that the omission of trademarks from the definition of intellectual property indicates that Congress intended for the decision in *Lubrizol* to control when a debtor-licensor rejects a trademark license. *See, e.g., In re Global Holdings, Inc.*, 290 B.R. 507, 513 (Bankr. Del. 2003) ("[S]ince the Bankruptcy Code does not include trademarks in its protected class of intellectual property, *Lubrizol* controls and the Franchisees' right to use the trademark stops on rejection."). LFAC adopts this same line of reasoning in arguing that, in the event of a rejection, the trademark Licensees would not be protected by § 365(n).

This Court adopts a position which differs from LFAC's limited view of § 365(n), and holds that reasoning by negative inference is improper in the context of the rejection of trademark licenses. As detailed in his concurring opinion in *In re Exide Technologies*, 607 F.3d at 966, Judge Ambro affirmed, "I believe such reasoning is inapt for trademark license rejections." In support for this approach, the Court directs its attention to Congress's explanation in the Senate committee report on the bill for § 365(n). Therein, Congress stated:

> [T]he bill does not address the rejection of executory trademark, trade name or service mark licenses by debtor-licensors. While such rejection is of concern because of the interpretation of section 365 by the *Lubrizol* court and others, *see, e.g., In re Chipwich, Inc.,* 54 Bankr. Rep. 427 (Bankr. S.D.N.Y. 1985), such contracts raise issues beyond the scope of this legislation. In particular, trademark, trade name and service mark licensing relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and **to allow the development of equitable treatment of this situation by**

> **bankruptcy courts.** . . . Nor does the bill address or intend any inference to be drawn concerning the treatment of executory contracts which are unrelated to intellectual property.

S. Rep. No. 100-505, at 5 (emphasis added). The Court shares Judge Ambro's perspective that Congress intended the bankruptcy courts to exercise their equitable powers to decide, on a case by case basis, whether trademark licensees may retain the rights listed under § 365(n). Here, the Court finds that it would be inequitable to strip the within Licensees of their rights in the event of a rejection, as those rights had been bargained away by Debtors.

> Courts may use § 365 to free a bankrupt trademark licensor from burdensome duties that hinder its reorganization. They should not . . . use it to let a licensor take back trademark rights it bargained away. This makes bankruptcy more a sword than a shield, putting debtor-licensors in a catbird seat they often do not deserve.

*In re Exide Technologies*, 607 F.3d at 967-68. LFAC argues that such equitable considerations should not come into play when, as here, Debtors have sold their assets to a bona fide purchaser. While some courts have suggested that § 365(n) rights of third parties should succumb to the interests of maximizing the bankruptcy estate in liquidation contexts, this Court finds no basis for such a distinction. Bankruptcy estates, whether reorganizing or liquidating, benefit already from the ability to assume or reject executory agreements. There is no reason to augment such benefits at the expense of third parties and a licensing system which Congress sought to protect by means of preserving certain rights under § 365(n). Indeed, in sale cases, which currently dominate the retail Chapter 11 landscape, monetary recoveries primarily benefit the pre-petition and post-petition lenders and administrative claimants. Minimal distributions to general unsecured creditors are the norm. It is questionable that Congress intended to sacrifice the rights of licensees for the benefit of the lending community. Rather, as noted by Judge Ambro,

Congress envisaged the Bankruptcy Courts as exercising discretion and equity on a case by case basis.

Finally, LFAC submits that, in the event Licensees were to make an election under § 363(n) to continue using the trademarks, LFAC would be placed in a licensor-licensee arrangement that it never intended to assume. Yet, LFAC or any other purchaser, has come into this transaction with eyes wide-open, after engaging in due diligence, and can adjust their purchase price to account for such existing License Agreements. The Court does not conclude that Licensees' trademark rights should be vitiated completely to aid in LFAC's recovery under its credit bid.

Putting equitable considerations aside, the Seventh Circuit in *Sunbeam Products, Inc.*, *supra*, iterated that rejection of a trademark license did not strip away the licensee's right to use the trademark.[3] 686 F.3d at 377. The Seventh Circuit focused on the text of § 365(g), under which rejection is deemed a breach of contract, and the unfulfilled obligations of a debtor-licensor are turned into a damages award. *Sunbeam Products, Inc.*, 686 F.3d at 377. The Seventh Circuit noted that "[o]utside of bankruptcy, a licensor's breach does not terminate a licensee's right to use intellectual property." *Id.* at 376. Moreover, in the real estate context "a lessor that enters bankruptcy could not, by rejecting the lease, end the tenant's right to possession and thus re-acquire premises that might be rented out for a higher price. The bankrupt lessor might substitute damages for an obligation to make repairs, but not rescind the lease altogether." *Id.* at

---

[3] While Judge Ambro based his concurring opinion on the bankruptcy court's equitable powers, the Seventh Circuit rejected the notion that equity governs a licensee's rights, and based its decision on different grounds. Nevertheless, both approaches yield the same result: that *Lubrizol*'s holding is not persuasive in the context of rejected trademark licenses.

377. The court specifically noted that "nothing about this process implies that any rights of the other contracting party have been vaporized." *Id*.

LFAC further argues that this result would leave LFAC with little ability to control the quality of products or services, as is notably important in trademark licensing. However, the Court recognizes that there are protections in place, outside of bankruptcy, that give rise to the incentive for Licensees to maintain a certain standard of quality in using the licensor's trademark.

> [A] licensee's sale of trademarked goods of a quality differing from the licensor's set standards constitutes trademark infringement and unfair competition. As a result, "there are already incentives for licensees to maintain the licensor's quality control provisions lest a court find the licensee liable for infringement. The licensee is also, in effect, warranting to the public that its goods are of the same level of quality that the trademark signifies. Thus, the mechanism of market forces and the anti-fraud laws make it highly unlikely that licensees will abandon the quality standards to which they originally agreed."

David M. Jenkins, Comment, *Licenses, Trademarks, and Bankruptcy, Oh My: Trademark Licensing and the Perils of Licensor Bankruptcy,* 25 J. Marshall L.Rev. 143, 162–64 (1991) (citations omitted).

The Court is cognizant of a bill recently passed by the U.S. House of Representatives, which seeks to include "trademarks" in the Bankruptcy Code definition of "intellectual property," and further seeks to add language to § 365 which would provide that "in the case of a trademark . . . the trustee shall not be relieved of a contractual obligation to monitor and control the quality of a licensed product or service." Innovation Act of 2013, H.R. 3309, 113th Cong.

§ 6(d) (2013).  Although not dispositive to this Court's decision[4], the fact that this legislation is pending suggests that Congress is aware of the prejudice to trademark licensees from the approach espoused by LFAC, and is attempting to remedy the omission of "trademarks" from its definition of "intellectual property".

**(II)    *A sale of Debtors' assets pursuant to 11 U.S.C. §§ 363(b) and (f) does not trump nor extinguish the rights of third party licensees under § 365(n), in the absence of consent.***

Sections 363(b) and (f) of the Bankruptcy Code permit a debtor-in-possession to make a sale of a debtor's assets free and clear of any interest in property. LFAC contends that the sale of Debtors' assets pursuant to these Code sections effectuated a free and clear conveyance of Licensees' trademark rights to LFAC, such that the dictates of § 365(n) no longer come into play. The Court disagrees and rules that the interests held by Licensees were *not* extinguished by the sale because in the absence of consent, a sale under § 363(f) does *not* trump the rights granted to Licensees by § 365(n).

**(A)    *Consent***

LFAC argues that Licensees impliedly consented to the vitiation of their § 365(n) rights by failing to object to the Sale Motion. The Court disagrees. LFAC relies on a line of cases which set forth the notion that failure to object equates to consent for purposes of § 363(f). However, integral to the decision in each of those cases was the fact that the non-objecting

---

[4] Indeed, several courts have referred to pending legislation to aid in rendering a decision. *See, e.g., In re Braman*, No. 02–21332, 2003 WL 25273839, at *4 n.15 (Bankr. D. Idaho Mar. 31, 2003) ("The Court notes that pending bankruptcy legislation would remove the modifier "substantial" from the § 707(b) concept of abuse . . . ."); *Phillips v. Hood River School District*, No. CV 98-1161-AS, 1999 WL 562682, at *6 (D. Or. Apr. 22, 1999) ("[T]he court also notes that legislation is pending with the Oregon Legislature that will resolve the precise issues faced by the court.); *Sherman v. Smith,* No. 92-6947, 1993 WL 433317 at *6 n.2, (4th Cir. Oct. 27, 1993) ("[I]t may be appropriate to note that under legislation currently pending in Congress, 28 U.S.C. § 2254(d) would be amended to make clear that the State bears the burden of persuading the court that constitutional error was harmless on federal collateral review.").

parties were provided with adequate notice. *FutureSource, LLC v. Reuters*, 312 F.3d 281, 285

(7th Cir. 2002) ("[L]ack of objection (**provided of course there is notice**) counts as consent.");

*In re Tabone, Inc.,* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) ("The Notice of Private Sale issued

by the trustee **clearly states** that the sale was to be free and clear of all liens"); *In re Elliot,* 94

B.R. 343, 345 (E.D. Pa. 1988) ("Citicorp consented to the sale by failing to make any timely

objection **after receiving notice of the sale**.") (emphasis added). By contrast, and for the reasons

below, the Court finds that Licensees were not provided with adequate notice that their rights

were at risk of being stripped away as a consequence of the sale.

At the outset, the Court notes that a party in interest must first traverse a labyrinth of

cross-referenced definitions and a complicated network of corresponding paragraphs with

annexed schedules in order to discern exactly what has been offered for sale in this matter.  As

noted by BSL's counsel:

> Annexed to the Debtors motion for the approval of the APA is a
> copy of the APA itself, annexed thereto as "Exhibit A." In the
> motion itself the Debtor refers, at paragraph 13, to the "Purchased
> Assets," which, in turn, refers to section 2.1 of the APA for its
> definition. The term and paragraph itself then refer to those items
> as more particularly described in schedule 2.1 of the "Seller
> Disclosure Schedule." The purchased assets again refer to a term
> defined in the purchase agreement at paragraph 2.1 called the
> "Purchased Intellectual Property." The excluded assets defined in
> subparagraph (c) of paragraph 13 of the motion for approval of the
> sale list a number of items including "Excluded Contracts" and
> "any Assumed Contract that requires the consent of a third-party to
> be assumed and assigned hereunder as to which, by the Closing
> Date, such consent has not been obtained...." All capitalized terms
> are defined in the APA.
>
> On page 8 of the APA, the Debtors and LFAC define the
> "Purchased Assets." These include "all Assumed Contracts" and,
> at subparagraph (n) of paragraph 2.1, they provide for the
> "Purchased Intellectual Property." The term "Purchased
> Intellectual Property" is, in turn, defined on page 6 of the APA, as

among other things, "all of the following intellectual property owned by Sellers: the recipes used in the business or otherwise listed on section 1.1(d) of the Seller Disclosure Schedule. . . the Trademarks listed on section 5.7(a) of the Seller Disclosure Schedule". The "Seller Disclosure Schedule" is defined as "the disclosure schedule delivered by Sellers to Purchaser not later than five (5) business days following the date hereof." The term "Assumed Contracts" is, in turn, defined on page 2 of the APA as those contracts that are set forth in section 2.1 (a) of the Seller Disclosure Schedule and "have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by Sellers or designated as Excluded Contracts pursuant to section 2.6(b)."

Paragraph 2.2 of the APA, on page 9 thereof, refers to Excluded Assets as including at subparagraph (f) "all Excluded Contracts". That term, in turn, is defined at page 3 of the APA, "'Excluded Contracts' means the Contracts set forth on Section 1.1(a) of the Seller Disclosure Schedule. . . ." As further discussed below, the Seller Disclosure Schedule, placed before the Court by LFAC for the first time with its moving papers, specifically lists the subject license agreements as among the "Excluded Contracts."

*Docket No. 282, Response of BSL, p. 3-4.* This Court must admit, candidly, that it has difficulty following the definitional maze put in place under the APA. Not only is it unclear as to what was being sold, there is no clear discussion as to what rights were purported to be taken away as a result of the sale. Thus, Licensees had no apparent reason to believe that an objection would be necessary in order to retain their rights under § 365(n).[5] Indeed, the inclusion of the specific License Agreements on the Seller Disclosure Schedule as "Excluded Assets" only adds to the confusion facing Licensees attempting to discern their rights and suggests to a reasonable person that their interests will be unaffected by the Sale Motion.

---

[5] For lack of notice, Licensees also missed the opportunity to request adequate protection pursuant to § 363(e).

In *In re Lower Bucks Hospital*, 571 F. App'x 139 (3d Cir. 2014), the Third Circuit

excised a third party release from a Chapter 11 plan on the basis that it was not adequately

disclosed to the affected parties. The Third Circuit stated:

> **[T]he reference to the Release in the disclosure statement was
> contained in a single paragraph in a 62–page document**. No use
> **was made of underlined, italicized or boldfaced text to
> emphasize the Release or to distinguish it from the more
> typical releases between the parties to the settlement.**
>
> **The reference in the proposed plan of reorganization was even
> less direct and similarly obscured by myriad other information
> disclosed. The Release was also omitted from numerous
> sections of the disclosure statement where it was arguably
> relevant**, including: (1) Summary of Key Terms of the Plan; (2)
> Summary of Distributions Under the Plan; (3) The Bond Trustee
> Litigation; (4) Treatment of Claims Against the Debtors; and (5)
> Conditions Precedent to Confirmation of the Plan and the
> Occurrence of the Effective Date. As Judge Frank explained, "[i]n
> both presentation and placement, the documents sent to the
> Bondholders did not differentiate the Third[-]Party Release from
> any of the other information provided, and **no effort was made to
> bring the existence of the Third–Party Release to the eyes and
> attention of the Bondholders**." Far from an abuse of discretion,
> the record in this case amply supports Judge Frank's conclusion
> about the inadequacy of disclosure.

*In re Lower Bucks Hosp.,* 571 F. App'x at 143 (emphasis added) (citations omitted). In the case

at hand, the Court is cognizant of what is missing from Debtors' pleadings. Nowhere in Debtors'

Sale Motion or supporting submissions did Debtors state anything about the treatment of the

Licensees in particular, or the effect that the sale would have on their rights. The APA also

lacked any lucid and specific language that would place Licensees on notice that their rights

were to be vitiated upon the execution of the contemplated sale.[6] Granted, the Proposed Order,

---

[6] Furthermore, the APA made many references to a Seller Disclosure Schedule, which Debtors failed to attach to the
moving papers that were filed on July 14, 2014.

attached as part of Debtors' moving papers, addressed that the sale was to be clear of licensees'

rights. Embedded in the Proposed Order was the following language:

> Except to the extent otherwise provided for in the [APA], title and
> interest in and to the Purchased Assets shall pass to the Purchaser
> at Closing free and clear of all liens (as that term is defined in
> section 101(37) of the Bankruptcy Code), claims (including, but
> not limited to, any "claim" as defined in Section 101(5) of the
> Bankruptcy Code), interests, and encumbrances, including, but not
> limited to, any lien (statutory or otherwise), hypothecation,
> encumbrance, liability, security interest, interest, mortgage, pledge,
> restriction, charge, instrument, license, preference, priority,
> security agreement, easement, covenant, reclamation claim,
> pledge, hypothecation, cause of action, suit, contract, right of first
> refusal, offset, recoupment, right of recovery, covenant,
> encroachment, option, right of recovery, alter-ego claim,
> environmental claim, successor liability claim, tax (including
> foreign, federal, state and local tax), Governmental Order, of any
> kind or nature (including (a) any conditional sale or other title
> retention agreement and any lease having substantially the same
> effect as any of the foregoing, (b) any assignment or deposit
> arrangement in the nature of a security device, (c) any claim based
> on any theory that the Purchaser is a successor, transferee or
> continuation of any of the Debtors, or (d) any leasehold interest,
> **license or other right, in favor of a third party** or the Debtors, to
> use any portion of the Purchased Assets), whether secured or
> unsecured, choate or inchoate, filed or unfiled, scheduled or
> unscheduled, noticed or unnoticed, recorded or unrecorded,
> contingent or non-contingent, perfected or unperfected, allowed or
> disallowed, liquidated or unliquidated, matured or unmatured,
> disputed or undisputed, material or non-material, known or
> unknown . . . pursuant to Section 363(f) of the Bankruptcy Code,
> with all such Liens and Claims upon the Purchased Assets to be
> unconditionally released, discharged and terminated"

*Docket No. 22, Proposed Order, p. 10* (emphasis added). However, the reference to the third

party licenses was a mere ten words, buried within a single twenty-nine page document, which

itself was affixed to a CM/ECF filing totaling one hundred twenty-nine pages. Debtors' moving

papers collectively failed to direct attention specifically to the proposition that the sale would

strip Licensees of their rights or to bring such consequence to Licensees' attention.[7] The Sale Motion did not identify individual Licensees, reference § 365(n) rights, or reflect that assumption/rejection of the License Agreements was unnecessary as a result of the § 363 sale. Certainly, no mention of these issues was brought before this Court at the hearing on the Sale Motion.

The Court posits that the content of the Sale Motion was a calculated effort to camouflage the intent to treat the License Agreements as vitiated without raising the specter of § 365(n) rights. Thus, it would be inequitable for this Court to find that Licensees consented to the termination of their rights. The Court is confident that had Licensees not been deprived of adequate notice regarding the extinguishment of their rights, they very well would have objected in a timely fashion, and the Court would have found that their rights under § 365(n) were intact.

### (B)   Interplay of 11 U.S.C. §§ 363 and 365

Since there has been little discussion on the interplay between § 363 and § 365(n), the Court is guided by cases that have interpreted the relationship between § 363 and § 365(h), as there are notable similarities between §§ 365(n) and 365(h).[8] The Court holds that in the absence of consent, nothing in § 363(f) trumps, supersedes, or otherwise overrides the rights granted to

---

[7] The parties clearly understand how to fashion such appropriate and unambiguous language placing Licensees on notice as to elimination of contractual rights. After the Sale Order was entered, Debtors filed the Rejection Motion, wherein Debtors explicitly sought to reject the License Agreements held with Licensees. While the Rejection Motion was later withdrawn in part, i.e., with respect to Licensees, Debtors' original attempt to reject the License Agreements at issue indicates a mutual belief that Licensees' rights were not extinguished as a result of the sale. Indeed, other license agreements were rejected after the sale. The Court is left to wonder why the filing of the Rejection Motion even was necessary if §§ 363(b) and (f) do in fact trump § 365.

[8] "Subsections (h) and (n) of § 365 apply to very different situations, but are somewhat similar in their approach to treating rejected lessees and licensees. . . . Thus, cases interpreting § 365(h) are helpful, if not persuasive, in addressing situations such as this one." *In re Dynamic Tooling Sys., Inc.,* 349 B.R. 847, 855-56 (Bankr. D. Kan. 2006). Under § 365(h), the lessee to a rejected real property lease may either treat the rejection as a lease termination and sue for monetary damages, or remain in possession for the balance of the lease and continue to make rent payments.

Licensees under § 365(n). This conclusion is based on two factors: the principle of statutory construction that the specific governs the general; and the legislative history of § 365.

It is well established that the appropriate way to construe a statute is to conclude that the specific governs over the general.

> An accepted principle of statutory construction is that the specific prevails over the general. *See Matter of Nobelman,* 968 F.2d 483, 488 (5th Cir. 1992), *aff'd,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) ("General language of a statute does not prevail over matters specifically dealt with in another part of the same enactment"); *In re Pacific Far East Line, Inc.,* 644 F.2d 1290, 1293 (9th Cir. 1981). "When there is potential for conflict, specific provisions should prevail over the more general." *In re Nadler,* 122 B.R. 162, 166 (Bankr. D. Mass. 1990) (citing *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

*In re Churchill Properties III, Ltd. P'ship*, 197 B.R. 283, 288 (Bankr. N.D. Ill. 1996). In *Churchill,* the court recognized that § 365(h) is specific, as it grants a particular set of clearly stated rights to lessees of rejected leases. That is, Congress specifically gave lessees the option to remain in possession after a lease rejection. If the court were to allow a § 363(f) sale free and clear of the lessee's interest, "the application of [§ 365(h)] as it relates to non-debtor lessees would be nugatory." *In re Churchill Properties*, 197 B.R. at 288. Indeed, "it would make little sense to permit a general provision, such as [§] 363(f), to override [§ 365's] purpose. The Code is not intended to be read in a vacuum." *Id.*

Like § 365(h), subsection (n) is specific in granting certain rights to licensees of rejected intellectual property licenses. The specific language in § 365(n) should not be overcome by the broad text of § 363(f). Accordingly, the general provision of § 363(f) does not wipe away the rights granted to Licensees by § 365(n). "[T]he recognition of Section 365 is more compelling and should rule the day." *In re Churchill Properties,* 197 B.R. at 287.

18

Moreover, the legislative history of § 365(h) evinces that Congress had the desire to protect the rights of tenants.

> A 1978 Senate Report remarked that under the terms of § 365(h), "the tenant will not be deprived of his estate for the term for which he bargained." S. Rep. No. 95–989, at 60 (1978). . . . The Section–by–Section Analysis of the 1994 amendments to the Bankruptcy Code further reflect a Congressional desire to protect the rights of those who are lessees of debtors:
>
>> This section clarifies section 365 of the Bankruptcy Code to mandate that lessees cannot have their rights stripped away if a debtor rejects its obligation as a lessor in bankruptcy. This section expressly provides guidance in the interpretation of the term "possession" in the context of the statute. The term has been interpreted by some courts in recent cases to be only a right of possession (citations omitted). This section will enable the lessee to retain its rights that appurtenant to its leasehold. These rights include the amount and timing of payment of rent or other amounts payable by the lessee, the right to use, possess, quiet enjoyment, sublet and assign.

*In re Zota Petroleums, LLC*, 482 B.R. 154, 161-62 (Bankr. E.D. Va. 2012) (citations omitted). The court in *In re Haskell L.P.,* 321 B.R. 1 (Bankr. D. Mass. 2005) also noted the legislative history to § 365(h), and denied the debtor's motion to sell real property free and clear of a leasehold interest under § 363(f) because such a sale would permit the debtor to achieve under § 363 what it was proscribed from achieving under § 365(h), namely, stripping the lessee of its rights to possession. This line of reasoning fits squarely with Congressional intent, and with the principle of statutory construction that the specific governs over the general.[9]

In arguing that the § 363 sale cut off Licensees' rights, LFAC relies on *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir. 2003), wherein the Seventh Circuit held

---

[9] *See also In re Taylor,* 198 B.R. 142 (Bankr. D. S.C. 1996); *In re Samaritan Alliance, LLC,* 2007 WL 4162918 (Bankr. E.D. Ky. Nov. 21, 2007); and *In re LHD Realty Corp.,* 20 B.R. 717 (Bankr. S.D. Ind. 1982).

that a sale under § 363(f) stripped a lessee of its rights to possession under § 365(h). The Seventh

Circuit reasoned: (1) the text of those sections of the Code does not suggest that one supersedes

the other; (2) the language of § 365(h) is limited in scope since it only references rejection and

does not mention anything about the sale of property of the estate; and (3) § 363 itself provides

protection in the form of adequate protection to those who may be negatively affected by a sale.

*Id.* at 547-48. For the aforementioned reasons, this Court is not persuaded by the reasoning set

forth in *Qualitech.*[10]

LFAC also relies on *Compak Companies, LLC v. Johnson*, 415 B.R. 334, 342-43 (N.D.

Ill. 2009)*,* where the court stated, "[a]s we interpret *Qualitech*, § 365(n) would not prevent the

trustee or the debtor-in-possession from extinguishing a license in a sale of intellectual property

free and clear of interests provided one of § 363(f)'s conditions was satisfied." However, the

court in *Compak* noted that the sale may not have been permissible without the express or

implied consent of the licensee. *Id.* at 343. "It is true that the Bankruptcy Code limits the

conditions under which an interest can be extinguished by a bankruptcy sale, but one of those

conditions is the consent of the interest holder, and lack of objection (provided of course there is

notice) counts as consent." *Compak Companies, LLC*, 415 B.R. at 343, quoting *FutureSource,*

*LLC v. Reuters*, 312 F.3d 281, 285 (7th Cir. 2002). As established above, Licensees did not consent

to the sale, neither expressly nor impliedly. Thus, Licensees' rights under § 365(n) shall remain

in place.

---

[10] "The rationale behind cases prohibiting the extinguishment of a sublessee's § 365(h) rights through a § 363 sale has been based in part upon the statutory construction principle that the more specific provision should prevail over the general. . . . Cases disapproving the § 363 sale of leases to extinguish § 365(h) rights also rely upon the legislative history of § 365(h) . . . ." *In re Zota Petroleums, LLC*, 482 B.R. at 161.

**(III)** ***Debtors are the only party entitled to the collection of royalties generated as a result of Licensees' use of licensed intellectual property.***

There is no question that Debtors' trademark, among other intellectual property, was sold to LFAC. However, explicitly excluded from the sale were the License Agreements between Debtors and Licensees, and the contract between Debtors and BSL. *Docket No. 268, Asset Purchase Agreement and Seller Disclosure Schedule 1.1(a).* Since the License Agreements themselves were not sold, and were neither assumed nor assigned, LFAC did *not* receive any rights under the agreements. Thus, while the trademarks and other intellectual property themselves were sold to LFAC, the rights as to the License Agreements remain with Debtors. As such, post-closing royalties generated by licenses would be due and owing to Debtors, *not* LFAC.[11] The Third Circuit's decision in *In re CellNet Data Sys., Inc.*, 327 F.3d 242 (3d Cir. 2003) dictates this very result.

In *In re CellNet,* a debtor sold its intellectual property to a buyer, but the licensing agreements debtors held with third parties were explicitly excluded from the sale. The debtor later rejected the licensing agreements and the licensees elected to continue using the intellectual property pursuant to § 365(n). The Third Circuit held that the debtor, *not* the buyer, was entitled to the royalties generated under the license agreements. The court noted, "[t]he plain language of § 365(n)(2)(B) indicates that the renewed royalties are directly linked to the rejected contract, not the intellectual property" and that "the contract is the primary mechanism for determining where the royalties flow." *Id.* at 251. Accordingly, since LFAC did not purchase the License

---

[11] Moreover, BSL has no ongoing or future rights under the Representation Agreement, which was simply an executory contract for services with Debtors. Upon rejection, BSL is left with only an unsecured claim. *See Sunbeam Products, Inc*, 686 F.3d at 377 ("[W]hen a debtor does not assume the contract before rejecting it, these damages are treated as a pre-petition obligation, which may be written down in common with other debts of the same class."). While the Court appreciates the extensive briefing and advocacy undertaken by BSL, its standing in this matter is highly questionable. BSL is not a party to any License Agreement.

Agreements, the post-closing royalties belong to Debtors. However, LFAC did acquire "[a]ll accounts receivable related to the [b]usiness." *See Asset Purchase Agreement ¶ 2.1(l).* Thus, unpaid pre-closing royalties would appear to fall within this purchased asset category.

This of course leaves open the question as to what happens to the License Agreements going forward. The Court is aware that BSL has offered to purchase an assignment of the rights under the agreements, yet the Court wonders how it can do so since it cannot perform the owners' obligations. LFAC owns the trademarks and other intellectual properties. The same stumbling block faces the Debtors. The Court surmises that only LFAC actually can perform under the License Agreements, and that rejection is necessary.

**CONCLUSION**

For the reasons stated above, LFAC's motion is denied. Trademark Licensees can be protected by § 365(n), notwithstanding the omission of "trademarks" from the Bankruptcy Code definition of "intellectual property." Furthermore, the sale under § 363(f) did not extinguish the rights afforded to Licensees by § 365(n) because Licensees did not consent to the sale. To the extent that Licensees' rights under § 365(n) were not vaporized by the sale, Licensees are entitled to elect to continue using the intellectual property granted under their respective License Agreements, for the duration of their terms. Royalties generated as a result of this use are payable to Debtors, because the agreements themselves have not been assumed, assigned or rejected, and thus continue to be Debtors' property.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: October 31, 2014